CITY OF MISSOULA, APPELLANT, v. BAKKE, RESPONDENT.

No. 8802.

Submitted January 29, 1948. Decided June 11, 1948.

198 Pac. (2d) 769.

Mr. Fred W. Schilling, of Missoula, for appellant. Mr. Schilling argued the cause orally.

Messrs. Mulroney & Mulroney, of Missoula, for respondent.

Mr. E. C. Mulroney argued the cause orally.

MR. JUSTICE CHOATE delivered the opinion of the court.

This action is brought by the city of Missoula to quiet title to certain "made" or built-up land deposited at the rear of lots 9 to 14 of block 56 of the W. J. McCormick addition to the city of Missoula during the time the city maintained a municipal dump at the rear of these and other lots.

Defendant claims ownership of said lands by deed from his predecessors in interest and by riparian rights. The trial court found for the defendant.

We eliminate from this opinion the question of title to the 25-foot alley running east and west 130 feet south of the south line of Front street, since the court adjudged the city to be the owner of said alley and quieted its title thereto.

Appellant's brief assigns 18 specifications of error but all are argued together. Collectively, they raise two questions, first, did the city of Missoula (hereinafter referred to as the city) acquire title to said land by deed from its predecessor in interest, and second, did it acquire title thereto by adverse possession?

For many years prior to 1930 the McCormick estate was the owner of said lots 9 to 14 inclusive of block 56 of the W. J. McCormick addition to the city of Missoula and other adjacent lots and blocks. Sometime prior to 1930 the city of Missoula established a municipal dump in the rear of all the lots in said block 56 and other lots not material here. In time this dump deposited an area of built-up or "made" land at the rear of said lots and pushed the Missoula river in a southwesterly direction, thereby enlarging the area of said "made" land from a depth of about 80 to about 250 feet, but not beyond the center line of the river as it was before its course was changed by the man-made additions.

All of this built-up land is shown on the map, plaintiff's exhibit 3, introduced in evidence herein, and constitutes the land involved in this action.

The city claims ownership of all the "made" land from the northeasterly line of the 25-foot alley shown on said plat and extending south to the Missoula river.

Plaintiff's title by deed, if it has one, rests upon a quitclaim deed, plaintiff's exhibit 2 executed February 12, 1938, by the trustees of the estate of Kate H. McCromick, deceased, and other grantors, to the city of Missoula. By this deed, said grantors released and quitclaimed to the city their interest in the real property south of the north line of the alley running through said block 56 and extending south to the bank of the south channel of the Missoula river.

Defendant's claim of title to said land rests upon the following conveyances and the riparian rights resulting therefrom. On February 24, 1936, Thomas N. Marlowe, the duly appointed, qualified and acting trustee of the estate of Kate H. McCromick, deceased, executed to Fred C. Follman, a deed to lots 9 to 14, inclusive, of block 56 of the McCormick addition to the city of Missoula, according to the official plat thereof. On January 20, 1944, Follman and wife conveyed said lots by a warranty deed to Walter J. Bakke. Defendant therefore claims that since he and his predecessors in interest is and were the owners of said lots 9 to 14 of block 56, they are the owners of all the land added to said lots by the city dump. The deed for the "made" land which was executed to the city by the McCormicks and others was given February 12, 1938, whereas the deed from the trustee of the Kate McCormick estate to defendant's predecessor Follman for the lots 9 to 14 of said block 56 was given February 24, 1936, almost two years before the city acquired its deed to said "made" land. If therefore, it be established that the deed from the McCormicks to Follman given in 1936 carried with it the riparian rights to said lots, then the deed which was given by the McCormicks and others to the city two years later purporting to convey these same rights, was a nullity.

*Effect of Alley Deed as a Severance of Riparian Rights.* To sustain its assertion that defendant did not acquire any ri-

parian rights to the lots in question, plaintiff advances the following contention: On August 11, 1930, the executrix of the estate of Kate H. McCormick, deceased, and other grantors, conveyed to the city a tract of land for alley purposes. This alley is 25 feet wide and extends in a general easterly and westerly direction parallel with Front street, across the "made" land at the rear of blocks 29 and 56 of the said McCormick addition to the city of Missoula, including the "made" land at the rear of lots 9 to 14 of said block 56. Plaintiff contends that the deeding of this alley to the city in 1930 at the time the McCormick estate was the owner of the lots in question, severed said "made" land from lots 9 to 14 and that land which is separated from water by a street or highway, the fee of which is in the municipality, is not riparian land. Citing 27 R. C. L., page 1075.

A later statement of the rule quoted above will be found in 56 Am. Jur., page 733, section 280, where it is stated as follows:

"Effect of Highway or Easement at or along Water Margin. While there is some authority to the contrary, the majority of the courts have followed the rule that land which is seperated from water by a highway or street the fee of which is in the public is not riparian land; but where the fee in the land covered by the highway or street is in the owner of the land, riparian rights remain in such owner."

As indicated by the text writer quoted above, the rule stated is not universal. A discussion of same will be found in 22 L. R. A., N. S., at page 674 in the accompanying case note with citation of authorities, of which we refer to the following: Ennis v. Grover, 53 Misc. 66, 103 N. Y. S. 1088, affirmed in 120 App. Div. 879, 105 N. Y. S. 1114. This case held that the existence of a public street or road between the water's edge of the upland and the tideland would not be permitted to separate riparian rights from the upland; Prior v. Comstock, 17 R. I. 1, 19 A. 1079. Without discussion as to who owned the fee in the street, this case lays down the broad proposition that in the absence of any reservation or incompatible grant, the laying

out of a street in front of uplands would not deprive the owner of his general riparian rights; Municipality No. 2 v. Orleans Cotton Press, 18 La. 122, 36 Am. Dec. 624. This case held that regardless of the ownership of the fee of a street lying between a tract of land and navigable water, the existence of such street does not prevent the gaining of alluvion from belonging to such land upon the ground that the lot owner's exposed situation burdens him with the risk of loss through the agency of the river, and he should be allowed the benefits which it might confer as a compensation.

Apart from the fact that the rule of severance contended for ▮ by the city is not universally recognized, we should be reluctant to apply it to the facts of the case at bar. In our opinion, the "severance" claimed is more technical than actual. It may be said that the alley "severed" the McCormick land north of the alley from that south of the alley. The alley, however, did not touch the water's edge. It did not lie "at or along the water margin" and it left a substantial area of "made" land which could be and was occupied and used without hindrance from the so-called severance. The alley did not in fact sever the entire tract of "made" land in the sense of separating or placing it apart from anything else. Instead, the alley ran over, upon and across the "made" land and all that the alley accomplished was to separate one piece of "made" land from another.

We are of the opinion that the "made" land south of the south line of the alley remained riparian land after the giving of the alley deed and that said riparian rights passed to the defendant's predecessor Follman and from him to the defendant. The cases cited in the dissenting opinion in support of the statement that the alley deed to the city cut off any right of Bakke to any interest in the land south of the alley, do not support the statement made. Had the deed to the alley described the south boundary of the alley as the river, then those cases and authorities would be applicable but since the river was not the

boundary of the alley these cases and authorities does not apply here.

*Effect of Deeds According to Official Plat as Carrying the Made Land.* The record in this case contains a stipulation that the lots in question abut on what is now called the Missoula river; that the water of the river actually goes to the edge of the land and that there is no land intervening between said lots and the river. Under such facts the provisions of section 6771, Revised Codes of Montana, 1935, become applicable, namely, that the owner of land which borders upon any other water than a navigable lake or stream, takes to the middle of the stream. This is also the rule in other jurisdictions. Thus in Brown v. Huger, 21 How. 305, 16 L. Ed. 125, the Supreme Court of the United States held that where a line is described as running in a certain direction to a river and thence up or down with the river, these words imply that the line is to follow the river according to its meanderings and turnings and in water courses not navigable, must be to the center of the stream. See also Conner v. Jarrett, 120 W. Va. 633, 200 S. E. 39, supporting the above rule.

In Carter Oil Co. v. Watson, 7 Cir., 116 F. (2d) 195, it is held that a grant of land bordering on a river carries to the grantee exclusive rights and title to the center of the river, unless by terms of the grant a different intention is clearly shown.

The case of Hutton v. Yolo Orchard Co., 203 Cal. 724, 265 Pac. 933, cited in the dissenting opinion is not in point with the case at bar because the circumstances there considered showed an intent to make the bank of the stream, not the center of the stream, the boundary.

Therefore, in the case at bar the transfer by the McCormick Estate to Follman of lots 9 to 14 according to the official plat thereof the Missoula river, which it is stipulated as a matter of fact is non-navigable, established the south line of said lots at the middle of the stream where it has been at all times since. The middle of the stream has always been a considerable distance south of the south point of the land as it now

exists. Admittedly, the "made" land in question was built up prior to the year 1930. We are of the opinion that this "made" land passed by the deed from the McCormick estate to Follman on February 24, 1936, regardless of the fact that the deed of conveyance described the land by reference to the official plat, where, as here, it was stipulated that the plat showed facts indicating that the lots extended to the middle of the river and that the river was actually the south boundary of the lots..

*Ownership of "Made" Land as Accretions.* Counsel for re- ██ spondent has cited in his brief a number of cases involving riparian lands which have been added to a main body of land by accretion. Without going into the distinction between "accretion," "reliction," "acclusion," and "alluvion," (See Farnham on Water and Water Rights, p. 320, sec. 69 and sec. 6820, Rev. Codes 1935) it is sufficient to note that "accretion" refers generally to the gradual and imperceptible addition of sediment to the shore by the action of water. In the case at bar the "made" land can scarcely be regarded as accretion since it was a deposit of land created by human agency as distinguished from one created by natural causes. However, the courts have sometimes applied the rule relative to the ownership of accretions to the ownership of "made" land created by human agency. We see no reason why that rule should not be applied to the case at bar since in principle there would seem to be no difference between the ownership of "made" land created by a city dump and ownership of similar land created by water-borne deposits resulting from natural causes. In Memphis v. Waite, 102 Tenn. 274, 52 S. W. 161, it was held that a riparian owner on the banks of a river is the owner of the accretions formed to his land even though these accretions are caused or greatly accelerated by the action of the city and public in making such land its dumping ground. See also Grant v. Fletcher, D. C., 283 F. 243; Gillihan v. Cieloha, 74 Or. 462, 145 Pac. 1061; Tatum v. City of St. Louis, 125 Mo. 647, 28 S. W. 1002.

*Adverse Possession.* In the closing lines of its brief, plaintiff

 :makes the claim that during all the time since 1930 the city has exercised ownership over the "made" land involved herein and that its title therein should therefore be quitted. We shall not discuss this assignment at length for the reason that there is ample evidence in the record to sustain the trial court's findings that such occupancy of said land as the city is shown to have established was, at least up to 1943 when the drill tower was built, neither exclusive nor open and adverse. See Le Vasseur v. Roullman, 93 Mont. 552, 20 Pac. (2d) 250 and cases cited. The fact is that both the city, the defendant and his predecessor Follman claimed to own the "made" land in question.

The following are a few of the acts of the defendant and his predecessor Follman tending to show their actual as well as asserted dominion over said property. In the year 1936, Follman gave permission in writing to the Portland Cement Company to store materials upon the following described premises: "All ground owned by the party of the second part lying between the Missoula river and Front street and upstream from the new bridge being built at the foot of Harris street as more specifically shown in defendant's exhibit C."

During the time that Follman owned the lots he stored lumber from time to time upon the disputed portion of the dump south of the alley and erected or caused to be erected electric light poles along said alley. Follman always claimed ownership of the land to the water's edge and several times when requested by the city engineer to give a deed for the land in question he refused to do so.

Bakke likewise claimed to own the "made" land and stored his trucks and equipment upon it. At the time of the trial he testified that there were probably 10 or 12 vehicles and about four or six dump boxes taken off trucks which were stored on that property. The fire chief requested him to remove this equipment but he refused to do so. On the record presented the court was warranted in finding that the city has not

542

established adverse possession or user of the "made" land involved in this action.

We have given consideration to all of plaintiff's other contentions but find them without merit. The judgment is affirmed.

Associate Justices Gibson, Angstman and Metcalf, concur.

MR. CHIEF JUSTICE ADAIR, dissenting:

Survey *lines*, definite and fixed, marked upon the ground and accurately represented on the plat by Washington J. McCormick, the original patentee, constitute the boundaries and show the limits of each and every lot in block 56 of patentee's addition to the city of Missoula. None of the lands here claimed by the city falls *within* such survey *lines* so bounding the lots nor do any of the lands fall *within* the *lines* constituting the boundaries and defining the limits of said addition. All the land which the city here claims lies wholly *without* and beyond the boundary *lines* fixed by the patentee and marked on his official plat to indicate the limits and extent of the area included in and comprising his said addition.

By deed dated January 20, 1944, Fred C. Follman and Louise Follman, his wife, conveyed to the defendant W. G. Bakke certain land described as "lots 9, 10, 11, 12, 13 and 14 in block 56 of McCormick's Addition to the City of Missoula, Montana, *according to the official map or plat thereof,* now on file and of record in the office of the county clerk and recorder of Missoula County, Montana." (Emphasis supplied.)

The only lands to which the defendant Bakke can or does show title are the above six lots as they are marked and shown on and "according to the official map or plat" of the addition.

"A plat is a subdivision of land into lots, streets, and alleys, marked upon the earth, and represented on paper; and hence the making and platting of it implies that the land has been surveyed, and that such survey was marked on the ground, so that the streets, blocks, and lots could be identified." 32 Words and Phrases, Perm. Ed., page 630, citing McDaniel v. Mace, 47

Iowa 509, 510; Burke v. McCowen, 115 Cal. 481, 47 Pac. 367, 368. See also Gaddy v. Pendleton, 171 Ark. 878, 286 S. W. 1025. 3 Bouvier's Law Dictionary, Rawle's 3rd Ed., page 2597, defines the word "plat" as: "A map of a piece of land, on which are marked the courses and distances of the different *lines*, and the quantity of land it contains." (Emphasis supplied.) Black's Law Dictionary defines a "plat" as: "A map, or representation on paper, of a piece of land subdivided into lots, with streets, alleys, etc. usually drawn to a scale."

The official map or plat of "W. J. McCormick's Addition" also known as "McCormick's Addition," drawn to scale, was made September 5, 1882, and filed in the office of the county clerk and recorder of Missoula county, Montana, on January 3, 1883.

The making and filing of the plat or map of "McCormick's Addition" implies that said addition had been surveyed, and that the map or plat thereof filed was based upon said survey, and that such survey was marked upon the ground, so that the streets, blocks, and lots could be identified; for, without such survey and marking being resorted to, neither block 56, nor the "lots 9, 10, 11, 12, 13 and 14" thereof claimed by the defendant and cross-complainant Bakke, could be identified, and his deed would be held void for that reason, and that would defeat the action pleaded in his cross-complaint. Burke v. McCowen, supra.

To operate as a legal conveyance it is essential that the lands intended to be conveyed be described with sufficient definiteness and certainty to locate and distinguish them from other lands of the same kind. "If the land intended to be conveyed is not identifiable from the words of the deed, aided by extrinsic evidence explanatory of the terms used or by reference to another instrument, the deed is inoperative." 16 Am. Jur., Deeds, p. 584, sec. 260. See also Kenyon v. Knipe, 2 Wash. 394, 27 Pac. 227, 13 L. R. A. 142 at page 145 and Gaddy v. Pendleton, supra.

*According to the Official Map or Plat.* Plaintiff's exhibit 4

544

purports to be a tracing made of a segment or portion of the official plat made September 5, 1882, and filed January 3, 1883, showing "lots 9, 10, 11, 12, 13 and 14 in block 56 of McCormick's Addition." The exhibit has *lines* drawn thereon indicating each and all the boundaries and limits of said lots. The exhibit shows: That the north boundary *line* of each of the lots is the south boundary *line* of Front street; that each lot is 30 feet in width; that each lot fronts on Front street; that the lateral boundary *lines* of each of said lots are straight *lines* run at right angles to the south boundary *line* of Front street and extending southerly therefrom; that when scaled the longest lateral boundary *line* of any of the lots is the west lateral boundary line of lot 14 which measures 90 feet in length; that the shortest lateral boundary *line* of any of the lots is the east lateral boundary line of lot 9 which measures 80 feet while the lateral boundary lines of each of the other lots are all less than 90 feet and more than 80 feet in length, the east lateral boundary *lines* of lots 13 and 12 measuring 86 feet and 84 feet respectively. Thus according to the plat, exhibit 4, none of the lots has a greater depth or length than 90 feet.

The exhibit also shows the south boundary *line* of each of the lots to be a *line* which connects the south termini of said lateral boundary *lines* of the lots. This *line* not only constitutes the south boundary *line* of the six numbered lots mentioned in defendant's deed but it is also the south boundary *line* of W. J. McCormick's Addition, there being no streets, alleys or lots surveyed, platted or shown to the south of the aforesaid boundary *line* of the lots.

Notwithstanding that the above deed calls for the six numbered lots "according to the official map or plat thereof" the majority opinion herein declines to recognize as the south boundary of the lots, the *line* drawn on the plat, exhibit 4, which definitely closes the south ends of the lots and such opinion moves the south boundary of the lots south thereof to the variable water's edge (which in 1946 at the time of the trial was then 413 feet south of Front street) and then extends

such boundary further south another unmeasured and unknown distance to the variable center or thread of the ever changing north channel of the river thus rendering most indefinite and uncertain the south boundary of the lots and the area thereof which Washington J. McCormick, the original patentee, intended to and did, at the very outset, make definite and certain in his carefully prepared plat of his addition.

The patentee made accurately measured, fixed survey *lines* marked upon the 'earth and thereafter represented and drawn to scale on paper, the boundary *lines* marking the extent and limits of his addition and of the lots therein and no court should ignore the intent so made manifest, disregard such definite *lines* so fixed and intended to be the boundaries of the lots in question and substitute therefor the indefinite and uncertain thread of an ever-changing river channel.

Because many important features have been overlooked in the majority opinion, I feel impelled to here rather fully canvass the facts as well as the law applicable thereto.

*The Facts.* This is a suit in equity brought by the city of Missoula, plaintiff, against the defendant, W. G. Bakke, to quiet the city's title to a strip of land situate along the north bank of the present north channel of the river in Missoula county, Montana, variously known as the Hell Gate or the Missoula river.

The north boundary line of the strip is an east-west surveyed line 130 feet south of and paralleling for a distance of 578.1 feet the south boundary line of Front street in the city of Missoula. The strip extends south from its north boundary line to the more or less irregular bank of the north channel of said river. The particular portion of the strip here in question measured from its north boundary line south to the bank of the river varies from a minimum of 225 feet to a maximum of 310 feet.

All the lands involved in this action are situate wholly within the boundaries of the northeast quarter of section 21, township 13 north of range 19 west of the Montana principal meridian, Missoula county, according to the official plat of the gov-

ernment survey of said land returned to the General Land Office by the surveyor general. Such plat, being defendant's exhibit A, shows said section 21 to be a regular section containing 640 acres and the northeast quarter thereof to be a regular and full quarter section containing 160 acres.

The above plat is conformable to the field notes of the original survey of such lands made in 1870 by the government surveyor, William H. Baker, a certified copy of which field notes was introduced in evidence as defendant's exhibit B.

The river enters the northeast quarter of section 21 near the southeast corner of said quarter section and, pursuing a general northwesterly course, it flows diagonally across and through said quarter section. According to the government field notes the width of the river at the place where it crossed the east boundary line of section 21 was 3.66 chains and its width where it left the section and crossed the west boundary line thereof was 3.16 chains. At 4.34 chains south of the south bank of the river there was a bench 20 feet high. In surveying east on a random line along the north line of section 21, the field notes indicate a bench 20 feet high two chains west of the northwest corner of the northeast quarter of said section 21, and the general character of the land to the east thereof as "nearly level."

It is stipulated that the river as it crosses said northeast quarter of section 21 is non-navigable and that its shores have not been meandered.

By patent dated May 13, 1878, the United States granted all of said northeast· quarter of section 21 to Washington J. McCormick. By such patent the patentee acquired the fee simple title to all the lands lying within the boundaries of the described quarter section according to the official government plat of the survey of such land.

In 1882 the patentee, Washington J. McCormick, caused a portion of said northeast quarter of section 21 lying to the north of the river to be surveyed and platted into blocks, town lots, streets and alleys, a plat whereof drawn to scale was made under date of September 5, 1882.

On January 3, 1883, the aforesaid plat was filed in the office of the county recorder of Missoula county and duly approved by the proper authorities, creating and establishing W. J. McCormick's Addition to the town of Missoula.

There is no evidence in the record that any part of the river was surveyed, platted or included within the boundaries of said addition nor is there any evidence that when said plat was made in 1882 or when it was approved and accepted in 1883 that the river anywhere crossed the exterior boundaries of said addition or that the addition so surveyed and platted included within its boundaries any part or portion of the river.

By deed dated September 10, 1887, the patentee Washington J. McCormick, conveyed to his wife, Kate H. McCormick, certain particularly described lands including all of block 56 except lot number one of said block 56 situate in the grantor's said addition to the townsite of Missoula, Missoula county, Montana Territory.

On September 10, 1927, Kate H. McCormick died leaving a will which was admitted to probate October 8, 1927, at which time letters testamentary issued to Honora M. Kobes who duly qualified. At the time of her death Kate H. McCormick was still the owner of the fee simple title to lots number 9 to 14, both inclusive, in block 56 of her husband's said addition. There is no evidence that Kate H. McCormick at any time placed any fence, enclosure, structure or other improvement on any of said lots or that she at any time claimed, occupied, used or exercised dominion over any lands *without* or beyond the exterior boundaries of her husband's addition as shown on the official plat thereof or over any lands located or situate more than 90 feet south of the south boundary line of Front street on which said lots front and which constitutes their north boundary line.

By deed dated August 11, 1930, filed for record January 28, .1931, and recorded in Book 111 of Deeds at page 393 of the records in the office of the county clerk and recorder of Missoula county, 19 named grantors including Honora M. Kobes, as executrix of the estate of Kate H. McCormick, deceased, de-

548

mised, released and forever quitclaimed to the city of Missoula, as grantee, the following described real estate situate in the city and county of Missoula, to-wit:

"Beginning at the extreme southwesterly end of the concrete retaining wall known as the 'West Front Street Retaining Wall.' Thence Northeasterly along the West end line of said wall a distance of twenty-five (25) feet. This latter point being one hundred and seven (107) feet distant from the South line of West Front street measured along the line between lots 3 and 4 of Block 29 of C. P. Higgins Addition to the City of Missoula. Thence N 55° 45′ W along the North line of the proposed alley a distance of Ninety-Nine (99) feet to an iron stake. This point being one hundred and thirty (130) feet from the south line of West Front Street, and at right angle to same, and being the intersection of the north line of the proposed alley with the west line of Lot 6, produced, in Block 29 of C. P. Higgins Addition to the City of Missoula. Thence N 41° 30′ West along the North line of the proposed alley parallel with the South line of West Front street a distance of five hundred seventy-eight 1/10 (578.1) feet to the East line of the proposed alley. Thence N 48° 30′ East at right angles to the North line of the proposed alley a distance of one hundred and thirty (130) feet to the south line of West Front Street. This point marked by an iron stake being Nineteen (19) feet West of the East line of Lot Sixteen (16) of Block Fifty-six (56) of said McCormick Addition. Thence Westerly along the South line of West Front Street a distance of twenty-five (25) feet to the West line of the proposed alley. This point marked by an iron stake fourteen (14) feet West of the West line of Lot Sixteen (16) of said McCormick Addition. Thence South 48° 30′ West along the proposed alley at right angles to the South line of West Front Street a distance of one hundred and fifty-five (155) feet to the Southwest corner of the proposed alley. Thence South 41° 30′ West along the South line of the proposed alley parallel with the North line of said alley a distance of twenty-five (25) feet to a point marked by an iron stake.

Thence continuing on the same course five hundred seventy-eight 1/10 (578.1) feet to an iron stake. Thence 55° 45′ East Ninety-nine (99) feet to the place of beginning. Magnetic variation 21° 30′ E,'' together with all the tenements, hereditaments and appurtenances thereunto belonging to have and to hold all and singular the said premises with the appurtenances unto the city and its successors and assigns forever.''

The foregoing deed conveyed to the city of Missoula title in fee simple to the particularly described strip of land so situate at from 130 to 155 feet south of and paralleling Front street and separated and cut off from the river lots 9 to 14 in block 56 in W. J. McCormick's Addition so fronting on Front street.

In its finding No. XVIII the trial court found that the above deed ''created and conveyed to said city'' said strip of land and in its finding No. XIX the trial court found that the city had used such strip of land since the year 1930 ''openly and adversely'' and without protest from the owners of lands bordering thereon. In its conclusion of law No. II the court holds that such deed ''granted, transferred and conveyed in fee simple'' to said city said strip or parcel of land. Such findings and conclusions are amply sustained by the facts and the law applicable thereto. See section 6856, Revised Codes of Montana 1935, and 16 Am. Jur., page 624, sections 330 and 331.

In accordance with the aforesaid findings and conclusions the judgment and decree adjudges that the city is the owner in fee simple of the aforesaid particularly described strip of land and the area thereof as shown in the said deed of August 11, 1930, and quiets the city's title thereto in fee simple. From such part and portion of the judgment neither the city nor the defendant has appealed, hence it was and is finally adjudged that the fee simple title to the described strip of land was and is in the city.

By deed dated February 12, 1938, filed for record and recorded August 30, 1939, in Volume 126 of Deeds at page 94, records of Missoula county, eight particularly named grantors, including Washington J. McCormick and R. W. Kemp, as

trustees of the estate of Kate H. McCormick, deceased, conveyed to the city of Missoula the fee simple title to all the real property lying, situate and extending south of the north line of the aforesaid strip of land to the bank of the north channel of the Missoula river together with all the tenements and hereditaments and appurtenances thereunto belonging to have and to hold all and singular the said premises with the appurtenances unto said city and its assigns forever.

The plaintiff city claims the fee simple title to the parcel of land described in its complaint all of which lies south of the north boundary line of the strip first conveyed, to which the city admittedly has the fee simple title. The city bases its right and title upon: (1) The aforesaid conveyances of August 11, 1930, and of February 12, 1938, and (2) upon adverse possession of said lands its complaint being clearly sufficient to support its claim of title by adverse possession. See section 9019, Revised Codes of Montana 1935; Violet v. Martin, 62 Mont. 335, 205 Pac. 221; Garbarino v. Noce, 181 Cal. 125, 183 Pac. 532, 6 A. L. R. 1433; Rogers v. Miller, 13 Wash. 82, 42 Pac. 525, 52 Am. St. Rep. 20; Allen v. Magill, 96 Ore. 610, 189 Pac. 986, 190 Pac. 726; 44 Am. Jur., sec. 79, p. 64 and cases cited in notes 13 to 14. Compare Pritchard Petroleum Co. v. Farmers Co-Operative Oil & Supply Co., No. 8743, 121 Mont. 1, 190 Pac. (2d) 55.

By deed dated February 24, 1936, filed for record and recorded March 2, 1936, in Volume 117 of Deeds at page 274, records of Missoula county, Thomas N. Marlowe, as trustee of the estate of Kate H. McCormick, deceased, grantor, conveyed to Fred C. Follman, grantee, "lots 9 to 14, inclusive, in block 56 of McCormick's Addition to the city of Missoula, Montana, according to the official plat thereof."

By deed dated January 20, 1944, Fred C. Follman and Louise Follman, his wife, conveyed the same numbered lots to the defendant W. G. Bakke, "according to the official map or plat thereof, now on file and of record in the office of the county clerk and recorder of Missoula county, Montana."

When lands are thus granted according to an official plat of

a survey, the particular plat referred to in the deed with all its notes, lines and descriptions becomes as much a part of the deed by which the lands are conveyed and control so far as the limits are concerned as if such descriptive features were written out upon the face of the deed or grant itself. See Vaught v. Mc-Clymond, 116 Mont. 542, 155 Pac. (2d) 612; Pittsmont Copper Co. v. Vanina, 71 Mont. 44, 227 Pac. 46; Phelps v. Pac. Gas & Elec. Co., 84 Cal. App. (2d) 243, 190 Pac. (2d) 209; 16 Am. Jur., page 593, section 273.

In construing a description of land, the intention of the parties is a controlling factor and such intention must be determined from the deed. Rioux v. Cormier, 75 Wis. 566, 44 N. W. 654; Clement v. Bank of Rutland, 61 Vt. 298, 17 A. 717, 4 L. R. A. 425.

"The description in a deed by reference to another instrument can be made certain, however, only by reference to the very map, plat, or deed referred to in the conveyance." 16 Am. Jur., p. 593, sec. 273.

No field notes of the surveyor making the survey of W. J. McCormick's Addition were produced or introduced in evidence. Neither was the official plan or plat of said addition dated September 5, 1882, and filed January 3, 1883, produced or introduced in evidence in this case.

*Disappearance of Original Plat.* At the outset of the trial of this suit the city's counsel, Mr. Schilling, remarked: "Well, I think the plat, the original plat, I think we could get and bring in." Later in the trial defendant's counsel, Mr. Mulroney, sought to introduce oral testimony pertaining to changes alleged to have been made through the years by dams and other artificial deflections and structures built by man in or along the channel of the river, to which offered testimony Mr. Schilling, the city's counsel, objected, whereupon the following occurred:

"The Court: Do you object to the offer?

"Mr. Schilling: Yes, we object, to all that offer. I believe if we bring that official plat up here that has been described

552

on Lots 9, 10, 11 and so forth, the official plat, that will answer the whole question.

"Mr. Mulroney: Well, I've got a copy of it if the court wants to see it right now?

"The Court: I think we will save time and move more rapidly by letting each party offer what evidence he wants to. You may make your several objections. Make one objection and that objection may go to all this line of testimony."

However, notwithstanding that counsel for both parties expressed an intention to offer in evidence the original plat of the McCormick Addition, being the plat in existence and of record prior to September 10, 1887, and therefore the plat contemplated by the patentee when he conveyed the lots to his wife, yet such original plat was not produced at the trial.

At a still later stage and while defendant was introducing evidence on its case in chief, the following occurred:

"Mr. Schilling: Your Honor, we would like to introduce the original plat of W. J. McCormick Addition. As stated at the outset of this case, the original plat of W. J. McCormick Addition had disappeared from the files of the Clerk and Recorder of Missoula County, but they have in what they call Plat Book No. I, at page 9, a certified copy of the plat; and it has been the custom around Missoula for attorneys and landholders and abstracters and all to accept the plat as appears on page 9 of Plat Book I, records of the Clerk and Recorder, Missoula County, as the official plat of W. J. McCormick's Addition. This book weighs about sixty or seventy pounds, quite a large book, and we would have to call the Clerk and bring the book up here just to have Mr. Babington identify it. We would then ask that this plat be admitted in evidence with the right to substitute a copy of the plat because, being an official record in Missoula County, it has to stay in the office. I talked to Mr. Mulroney about it and he said that is agreeable with him that we may make a copy of this plat and introduce it in evidence in this case.

"The Court: Very well.

"Mr. Schilling: With the understanding, of course, *the plat shows* that these lots 9 to 14 abut on the river (it says Missoula River) and that there is no land between Lots 9 and 14 and the bank of the river; in other words, that Lots 9 to 14, inclusive, Block 56 abut on the riverbank.

"Mr. Mulroney: Well, and on the river itself.

"Mr. Schilling: The riverbank and the river itself. That the water actually washes the bank."

*Plaintiff's Exhibit 4.* Neither plat book No. I nor page 9 thereof were produced or introduced in evidence but instead after all the testimony had been taken the city placed in evidence as plaintiff's exhibit 4 what purports to be a tracing made on April 10, 1946, by W. H. Swearingen, the city's engineer, being almost a month after the trial of this action which occurred on March 15, 1946. Exhibit 4 is here reproduced:

Town of Missoula
~ Scale 200'=1" ~
~ Sept 5ᵗʰ 1882 ~

TRACING OF
W.J. McCORMICK'S ADDITION.
AS SHOWEN ON
PAGE 9 PLAT BOOK 1
IN THE MISSOULA COUNTY CLERK
AND RECORDER'S OFFICE

Missoula City Engineer
April 10ᵗʰ 1946.

Admittedly plaintiff's exhibit 4 is not an exact tracing or copy of either the original plat of W. J. McCormick's Addition to Missoula filed January 3, 1883, nor is it an exact tracing or copy of page 9 of plat book No. I of the records of Missoula county as is shown by the stipulation concerning the exhibit entered into on June 24, 1946, being more than three months after the trial of the action.

*Stipulation re Exhibit 4.* The above stipulation is to the effect that the tracing, plaintiff's exhibit, "is a full, true and correct copy of the original plat of W. J. McCormick's Addition to Missoula, Montana, as shown on page 9 of Plat Book One in the office of the County Clerk and Recorder of Missoula County, Montana, *with the following exceptions*: "1. That the attached exhibit contains only those lots, blocks, streets and alleys and the Missoula River, which are pertinent to the issues involved in this action.

"2. That Lots 9 to 14, inclusive, Block 56, colored in pink on the enclosed plat, are not so colored on the original plat.

"3. That the figures 80', 84', 86' and 90' which appear on Lots 9, 12, 13 and 14, Block 56, on the attached plat, do not appear on the original plat.

"4. That the words, 'W. H. Swearingen, City Engineer,' together with the printing above the same, do not appear on the original plat.

"It Is Further Stipulated and Agreed, that both the original plat and the attached exhibit show that the waters of the Missoula River flow past said Lots 9 to 14, in Block 56, and that there is no land shown on the original plat or exhibit between said lots and the Missoula River.

"It Is Further Stipulated, that the attached plat may be considered as having been introduced in evidence at the trial of this action and marked Plaintiff's Exhibit 4, with the same force and effect as if the original plat had been introduced, and subject only to the above exceptions Nos. 1 to 4, inclusive.

"Dated at Missoula, Montana, this 24th day of June, 1946."

Clearly the tracing is not and it does not purport to be a full,

true or accurate copy of the original plat of W. J. McCormick's Addition as made September 5, 1882, and filed January 3, 1883, which is *the* plat which the original patentee, Washington J. McCormick, in 1887 had in mind and contemplated when conveying certain lots to his wife and it is *the plat* which Marlowe, the trustee of the estate of Kate H. McCormick, deceased, had in mind and referred to in his deed of February 24, 1936, to Fred C. Follman, and to which Follman and his wife referred in their deed of January 20, 1944, to the defendant Bakke.

There is no evidence as to when or by whom or by what authority the plat appearing on page 9 of the county's plat book No. I was made but legends on the tracing indicate that such map was drawn to a scale of 200 feet to the inch and that it purports to be a copy of a portion or segment of the plat made September 5, 1882, of W. J. McCormick's Addition. It is apparent that the plat of which the tracing purports to be a copy would and could be accurate and drawn to scale only as to the lands lying, situate and being *within* the exterior boundaries of the addition actually measured and surveyed, being the surveyed and platted streets, alleys, blocks, lots and area located *within* the addition and *within* the exterior boundaries and limits thereof and that the plat could not be and that it is not accurate as to any part or portion of the unmeasured, unsurveyed and unplatted area lying *without* the boundaries and limits of the addition.

As before stated there is no evidence that any part or portion of the river was measured, surveyed or platted or that in 1882 when the plat was made any part or portion of the river then flowed across, through or *within* any of the exterior boundaries of W. J. McCormick's Addition as surveyed and platted. Without measuring and surveying to the south of the exterior boundaries of the addition as platted, it would be, was and is impossible to accurately locate the area beyond or to accurately locate or fix the irregular shores and banks of the river or the water's edge or the high or low water marks or the width of the stream or the location of its thread. Hence there is no author-

ity in the record before us to support the statement in the majority opinion to the effect that in filling in, building and enlarging the area of the "made" land it was not extended "beyond the center line of the river as it was before its course was changed by man-made additions." There is no evidence of where such center line was located before the river's course was changed.

True exhibit 4 as drawn *shows*, as of the year 1882, "that these lots abut on the river and that there is no land between lots 9 and 14 and the bank of the river" but this case is not particularly concerned with where the river ran in 1882 when the original patentee owned the fee simple title to all the lands within the northeast quarter of section 21 including all the soil beneath any and all non-navigable sloughs, streams and rivers within the boundaries of such grant. Neither is the location of the river five years later of much concern when the patentee conveyed to his wife certain lots in the addition.

It is conceded that at all times since long prior to the death of Kate H. McCormick there was and still is a large area of artificially made land lying between lots 9 to 14 as shown on the plat and the river. All of such land lies *without* and to the south of McCormick's Addition as shown on the plat. Such tract of man-made land was there in 1930 when the city acquired title to a certain measured strip of it which has since been used as an alley, and of course such "made" land was there in 1936 when Follman obtained his deed to the six lots fronting on Front street to the north of the alley, in 1938 when the city obtained its deed to the lands lying to the south of the alley being located between the alley and the river, and in 1944 when Follman conveyed his six lots to Bakke.

It is the official approved plat filed by the patentee in 1883 that is referred to in the deeds subsequently given and not some other and different map, and the official plat should have been produced in this case or its loss satisfactorily accounted for by the testimony of the official custodian of the plat, being the county clerk and recorder. As was said in

Johnston v. Jones, 66 U. S. 209, 225, 17 L. Ed. 117: "The facts disclosed in the testimony show that Allen's map was not itself original and reliable evidence. A calculation founded upon it was therefore, clearly inadmissible."

*Notice to Follman.* At the time the six lots were conveyed to Follman (1936) there were no buildings, fences or improvements on any of the lots. Follman purchased the lots with notice of the prior deed to the city (1930) conveying to it the fee simple title to the strip of land lying to the south of the lots and paralleling Front street at a distance of 130 feet which deed had then been on record in the office of the county clerk and recorder of Missoula county for more than five years. Follman then also had notice of the fact that the city then kept, used and maintained said strip of ground as a public alley and that it had been so using said deeded strip of land for years previous. He also had knowledge that the lots which he was acquiring according to the plat of 1882 front on Front street, that the plat shows their maximum length to be but 90 feet, that they could not extend beyond the alley, some 130 feet distant, and that, because they were separated and cut off from the river by the strip of land to which the city then and now has the fee simple title, the lots then had no riparian rights.

Follman also then knew that the city was occupying, maintaining, and using the lands between the alley and the river as a city dump where it worked certain of its employees under the supervision of a regularly employed supervisor or dump attendant.

Before Follman placed any improvements whatever on any of the lots he consulted W. H. Swearingen, the city's engineer, whom he asked to assist in giving him the frontage of his lots on Front street and to locate the corners of the tract conveyed so as to enable him to construct his buildings in the proper place.

As requested Mr. Swearingen showed Mr. Follman the corners of the tract. In locating such corners the city engineer first located, on the south boundary line of Front street, the

northeast corner of lot 9, being the northeast corner of the tract, from which point the city engineer and Mr. Follman proceeded westerly along the south boundary line of Front street a distance of 180 feet, which distance they measured with a steel tape, and where was located the northwest corner of lot 14, being the northwest corner of the tract. From such corner they proceeded in a southerly direction in a straight line run at a right angle with the south boundary line of Front street a distance of 130 feet where said line intersected the north boundary line of the strip of land then owned and used by the city as a public alley, at which point of intersection the city engineer drove a stake to indicate the southwest corner of Mr. Follman's property. Since the north line of the strip of land owned by the city paralleled the south boundary line of Front street whereon was located the northeast corner lot No. 9, to locate the southeast corner of the tract, according to the directions of the city engineer, all Follman need do was to proceed easterly from the stake marking the southwest corner of the tract a distance of 180 feet keeping on the north boundary line of the alley.

Thus while the plat, exhibit 4, shows lot 14, being the westerly lot, to have a west lateral boundary line of but 90 feet and lot 9, being the easterly lot, to have an east boundary line of but 80 feet, the tract as measured by the city engineer and Follman extended the west boundary line of the tract an additional 40 feet and it extended the east boundary line of the tract an additional 50 feet over and above the scaled distances shown on the plat, exhibit 4, as the south boundary line of the lots and tract, but each of said lateral lines stopped at the north boundary line of the alley which the city engineer testified he pointed out to Follman as the south boundary of his land.

While the intention of the parties is a controlling factor and while such intention must be determined from the deed, yet in cases of this character the circumstances and surroundings of the parties and their conduct subsequent to the conveyance

may also be considered. The evidence shows that after the conveyance to Follman and after the city engineer had given him the correct frontage of the lots on Front street and had located the corners of the tract, immediately thereafter and in the spring of 1936 Follman built a carpenter shop on the westerly two lots, the front of which shop was built about ten feet from Front street and the rear thereof was located well to the north of the north boundary line of the alley. Follman also allowed a lessee to construct a warehouse on his lots to the east of his carpenter shop, which warehouse was also located to the north of the alley. These were the only structures erected on the lots during the time that they were owned by Follman and the location of each gives recognition to the north line of the alley as constituting the south boundary line of Follman's lots.

Shortly after Follman acquired title to lots 9 to 14 of block 56, the Portland Bridge Company, in 1936, under contract with the state of Montana, commenced the building of the Parkway bridge across the river immediately to the west of said lots. With the city's consent the bridge company piled building materials and erected several temporary sheds or buildings used for the storage of tools and as an office which were located partly in the city's alley and partly on the adjacent lands lying to the south thereof. Thereupon Mr. Follman appeared before the city council complaining that the bridge company was obstructing and blocking the public alley and requested the council to order the obstructions removed. Thereupon, at the direction of the council, the chief of police and the city engineer notified the bridge contractor to open the alley, which the contractor agreed to do. After a week or so had passed without the sheds being moved, the chief of police and city engineer again contacted the contractor only to find that in the meantime the contractor had completely silenced Mr. Follman's complaint about obstructing the city's alley by making a deal whereby in consideration of thirty dollars and of Follman's being given the woodwork to do on the bridge, the temporary sheds of the bridge company were to be left where they were.

Mr. Swearingen, the city engineer, on cross-examination by defendant's attorney, testified: "Mr. Follman objected to the occupancy of this area by buildings of the Portland Bridge Company, and then Mr. Meath of the Portland Bridge Company told Charlie the same as you stated, that he would give Follman work rather than move his buildings back across the alley."

During the eight years that Follman held title to lots 9 to 14 in block 56, he at no time placed any fence, enclosure, shed, building or other improvement on any of the lands lying to the south of the city's alley, but confined all his improvements to the lands extending north from the alley to Front street.

While Kate H. McCormick was the owner of the lots the city of Missoula constructed a high concrete retaining wall along the north bank of the river at a point to the east of block 56 of W. J. McCormick's Addition, thereby changing the north channel of the river and causing it to follow a more southerly course. The city also established a city dump to the north of said retaining wall and by artificial means, and under the direction and supervision of a dump attendant, employed by the city and stationed there, filled in and built up the land to the north of said wall and to the height thereof. The city also extended its dump westerly from the west end of said retaining wall establishing and maintaining a dump along the north shore of the north channel of the river to the west of the wall where the city and its inhabitants continued to dump and deposit refuse, gravel, earth and debris hauled from various parts of the city. By such artificial means more land was systematically made and built up entirely by man along the north shore of the north channel of said river thereby continually moving the channel of the river further to the south.

At the time of the trial the witness Swearingen, who had then continuously held the office of city engineer for the preceding 15 years, testified that during that time the city of Missoula had continuously occupied all the land south of the north line of the alley during which time the city had numerous

city employees working thereon grading and graveling the land on which the city had established a public parking lot and installed the fire department drill tower and during which time the only structures placed on the lands were the temporary sheds built by the Portland Bridge Company during its building of the Parkway Bridge. He further testified that the Missoula County Implement Company at one time had stored some machinery on the lots and that Floyd Hardenburgh had placed some advertising signs on the land but that each had removed such personal property therefrom on orders of the city council.

*Notice to Bakke.* At the time the defendant Bakke acquired his title to the described six lots (1944), he was charged with the notice imparted by the official files and records in the office of the county clerk and recorder of Missoula county affecting the property. He was chargeable with notice of the deed given the city more than 13 years previous and conveying to the city the fee simple title to the described strip of land 578.1 feet in length to the south of and paralleling Front street at a distance of 130 feet and separating and cutting off lots 9 to 14 from the river, said deed having been filed for record and recorded in the office of the county clerk and recorder on January 28, 1931. He also was chargeable with notice of the plat, being plaintiff's exhibit 3, which, pursuant to statute, was filed in the office of the county clerk and recorder on February 1, 1939, almost five years before Bakke acquired any interest in the lots.

A copy of exhibit 3 and also an enlarged section of said exhibit is here reproduced:

564

After proper foundation laid, through the examination of the witness Swearingen who made the map, plaintiff's exhibit 3, it was offered in evidence whereupon Mr. Mulroney, counsel for defendant, stated: "We don't object to the plat as a plat but it has on it certain writings which are the issues in this case, and with the understanding that those writings are not binding on us * * * With the understanding that any writing on it is not binding on us and is not to be considered evidence against us the same—The witness may testify as to what he knows about it, but to introduce that map in evidence with those things on it is having the map help decide the issues of the case, and the map is prepared, of course, by them." The following then occurred:

"The Court: Very well, the motion is granted that the map be admitted into evidence in so far as it will be identified by the witness, and further than that it may be used for illustrative purposes.

"Mr. Mulroney: Yes."

The exhibit was thereupon received in evidence and became prima facie evidence of the facts thereon stated.

In an equity case such as this the appellate court is required to review all questions of fact arising upon the evidence presented in the record and to determine the same as well as questions of law. Sec. 8805, Rev. Codes 1935. When as here the document introduced in evidence shows material matter in addition to that suggested by respective counsel and which matter must be considered in order to understand the balance of the document, then the appellate court, under section 8805, supra, may consider such additional matter so appearing. In Bordeaux v. Bordeaux, 43 Mont. 102, 115 Pac. 25, this court held that where letters admittedly written by one of the parties, though excluded below, were incorporated in the record, the appellate court, in making a final determination of the case will consider them. See also Strever v. Sinclier, 66 Mont. 258, 213 Pac. 253.

"A book or document offered in evidence must as a general

rule be considered in its entirety, the parts operating against the interest of the party offering it as well as the parts in his favor." 32 C. J. S., Evidence, page 699, sec. 774, and see sec. 775, note 25. Entries made by officers or boards and entries in official books are prima facie evidence of the facts therein stated. See sections 10498, 10570 and 10576, Revised Codes of Montana 1935; Westerman v. Cleland, 12 Cal. App. 63, 106 Pac. 606; 20 Am. Jur., p. 1065, section 1214 and cases in note 10; 20 Am. Jur., p. 770, section 914 and also section 1037.

The entries made on the map by the city engineer were made long prior to the commencement of this suit and long prior to the time the defendant received his deed to the lots, hence could not be considered as self serving statements by the city. See Texas Machinery & Supply Co. v. Ayers Ice Cream Co., Tex. Civ. App., 150 S. W. 750; Pawly v. First National Bank, 32 Ariz. 135, 256 Pac. 507; Bigelow v. Bear, 64 Kan. 887, 68 Pac. 73.

On the plat, exhibit 3, appears a certificate made some five years before Bakke acquired any title to lots numbered 9 to 14, reading as follows:

"The City of Missoula, Montana does hereby certify it has caused to be surveyed and platted the lands as shown by the plat and certificate of survey hereunto annexed the following described tract of land, to-wit: That Portion of Original Town Co., C. P. Higgins, and McCormick's Addition bounded as follows: to the north, to the alley shown herein which is 130 feet distant and Southerly from the south line of West Front St.; to the West, McCormick St.; to the South the Missoula River as shown in this plat and on the East to the alley immediately west of Higgins Ave. as described in Special Improvement Dist. No. 44. The whole being the parcel of land built by the City of Missoula along the North bank of the Missoula River and heretofore unplatted to be known and designated as 'Missoula Civic Center' and the lands included in the alley and the rebuilt (reclaimed) lands are hereby granted and donated to the use of the public forever.

"Dated this 17th day of January, 1939.

"The City of Missoula, Mont.

"By (signed) Dwight N. Mason, Mayor.

"State of Montana 
County of Missoula } ss. 
City of Missoula

"I, W. H. Swearingen, being first duly sworn on oath depose and say:—I am the City Engineer of the City of Missoula, Missoula County, Montana. That the City Council of the City of Missoula instructed me to survey and prepare this plat of the parcel of ground built by the City of Missoula along the north bank of the Missoula River.

"(Signed) W. H. Swearingen.

"Subscribed and sworn to before me the 23rd day of January, 1939.

"(Signed) J. I. McDonald, City Clerk."

Bakke also purchased the lots with full knowledge of the fact that the city had established and that it had for years kept, maintained and used and that it was then using its deeded ground to the rear of the lots as a public alley. He then had knowledge that an electric power line belonging to the Montana Power Company had been constructed on the strip of land deeded to the city, which power line extended down the alley in a westerly direction and served and furnished power for the buildings to the north of the alley on the lots which Bakke was purchasing. He then knew that to the south of his buildings and across the alley on land lying between the alley and the river the city had built and that it owned a drill tower then standing on the lands to the south of the alley and used by the city for the training of its firemen.

Bakke also knew of the presence of a public driveway constructed on lot 15, being the lot adjoining his lot 14 on the west, which public driveway leads south from Front street and connects with the city's alley at a point 130 feet south of the south boundary line of Front street and near the southwest corner

of the improvements constructed on the lots he was purchasing, which driveway and which alley then served said property and other property along the south side of Front street and which was then used by the public generally.

After Bakke acquired his deed he conducted a secondhand automobile, truck and machinery business on his lands fronting on Front street and in time he commenced reaching out and storing secondhand automobiles, trucks, tractors and road machinery on the lands claimed by the city lying to the south of its alley, but leaving, according to his own testimony, "just a little space around the firemen's drill tower," where such machinery and equipment was not strewn. This interfered with the city's use of its drill tower and with the training of its firemen whereupon the city council ordered Mr. Arthur Quinn, then chief of the city's fire department, to direct the defendant Bakke to remove his old trucks and secondhand machinery from the city's lands. Upon Bakke's refusal to remove such personal property from said lands, the city, on August 13, 1945, commenced this suit against him.

The suit is to quiet the city's title to only such lands as lie to the south of the north boundary line of the alley and the city makes no claim whatever to any part or portion of any of the lands lying between Front street and the alley.

In its complaint the city avers that it is the owner of, seized in fee, and in the actual possession of all the real property lying, being and situate between the north boundary line of the alley described in Volume 111 of Deeds at page 393 of the records in the office of the county clerk and recorder of Missoula county, "to the bank of the north channel of the Missoula River."

By answer the defendant Bakke first denies the city's claim of ownership of the parcel of land described in its complaint.

Next, by cross-complaint, the defendant Bakke claims that ever since January 20, 1944, he has been the sole owner in fee of, and in the exclusive possession of "Lots Nine (9), Ten (10), Eleven (11), Twelve (12), Thirteen (13) and Fourteen (14) in

Block Fifty-six (56) of W. J. McCormick's Addition to the City of Missoula, Montana.''

The city does not dispute defendant's claim of title to any of the lands situate to the north of the alley, which lands have a frontage of 180 feet on Front street and extend south therefrom. However, defendant's cross-complaint seeks to extend the lateral boundary lines of the lots a distance of 413 feet south from the south boundary line of Front street so as to include the city's alley and all the lands ''to the bank of the Missoula river.''

The means employed by the defendant in his pleading to so extend the lateral boundary lines of the lots from the maximum of 90 feet shown on the plat to 413 feet claimed in his cross-complaint, is by setting forth in his cross-complaint two different descriptions of the lands claimed, the first description being of lots 9 to 14 of block 56 of W. J. McCormick's Addition as above quoted and then in setting forth a second description alleging:

''That said real property is further described as follows: Beginning at the Northeast corner of Lot Nine (9) of said Block Fifty-six (56), which is on the south line of West Front Street, Missoula, Montana, thence running in a westerly direction along the south line of West Front Street a distance of 180 feet, which is the Northwest corner of said Lot Fourteen (14) in said Block, thence at right angles to the south line of West Front Street and in a southerly direction and along the west line of Lot Fourteen (14) in said Block Fifty-six (56) a distance of 413 feet, more or less, to the bank of the Missoula River (sometimes known as the Clark's Fork River), thence in an easterly direction and along the north bank of said Missoula River a distance of approximately 180 feet, thence at right angles and in a northerly direction and along the east line of said Lot Nine (9) of 413 feet, more or less, to the point of beginning.''

By reply the city admits defendant's ownership of lots 9 to 14, inclusive, in block 56 of W. J. McCormick's Addition but

further alleges that the description of said lots in said addition is according to the official plat thereof on file and of record in the office of the clerk and recorder of Missoula county and not as set forth and claimed in the second or amplified description averred in defendant's cross-complaint.

*The Issue.* Thus the pleadings present an issue as to the location of the south boundary of defendant's lots. Do they extend south from Front street a distance not exceeding 90 feet as shown on the plat or do they extend south from Front street "a distance of 413 feet more or less, to the bank of the Missoula River" as claimed by defendant in his cross-complaint?

The judgment not only carries the lateral boundary lines of Bakke's lots to the water's edge some 413 feet south of Front street as prayed for but it goes even further and extends such lines far beyond to the center or thread of the river.

As the owner of all the lands within the northeast quarter of section 21, the patentee was privileged to sell any part or portion or to reserve his title to any part or portion thereof. "The owner may sell or reserve title to the soil in the bed of the river, separate from the upland, or the upland without the bed of the river. It is only necessary to use such terms in describing the land that the ordinary presumption shall not apply. * * * Where the language of a deed shows a manifest intention to stop at the water's edge, it will prevail over the general presumption. The intention of the party is the real object sought. If the meaning is not clear, resort is had to rules of construction." 6 Thompson on Real Property, Perm. Ed., p. 665, sec. 3439.

According to the plat the south boundary of each lot is a definite mathematical *line* dividing the lands to the north conveyed to Kate H. McCormick from the lands to the south of such *line* in which the patentee reserved his title. Such certain, definite and fixed *line* and not an uncertain, indefinite and ever changing stream was selected and made by Washington J. McCormick as and for the boundary which marks the extent and limit of the area which he intended should comprise block

56 *within* his addition. And his deed conveys only the specified measured lands lying *within* the platted addition and not the unmeasured lands located *without* such addition.

Whether or not a person is the owner of riparian rights depends entirely upon the fact as to whether or not he owns land which is contiguous to and touches upon the water. "And where the river * * * is not mentioned as a boundary in the patent or deed, but the boundary is a permanent line fixed by courses and distances, metes and monuments 'between high and low-water mark,' the patentee was not a riparian owner." Clark on Surveying and Boundaries, sec. 299, p. 305.

Regardless of the distance of the river from the definite surveyed permanent line fixed by the patentee as the south boundary line of the lots in 1882 when the land was platted or in 1887 when the patentee conveyed to his wife, nevertheless the fact remains that in 1930 when the wife's estate conveyed to the city the fee simple title to the strip of land now used as an alley none of the lots in question then touched upon the stream and that none then had any riparian rights whatever.

In I Kinney on Irrigation and Water Rights, 2d Ed., p. 761, sec. 451, it is said: "And, in order for an individual or corporation to own riparian rights, they must not only exist originally, by their land touching upon the stream, *but they must also continue to exist in the same condition. Any interruption of the owner's land with the contact with the water will deprive him of his riparian rights.* Thus the granting of a strip of land next to the water, or the laying out of a road or highway along the water, the title to which is in the public, will deprive the original owner of his riparian rights." (Emphasis supplied.)

In 1 Wiel on Water Rights in Western States, 3d Ed., it is said: "Only those who own land touching the stream and in contact with its flow are riparian proprietors." P. 784, sec. 723. Again: "If riparian property becomes divided between two owners, so that one portion no longer adjoins the stream, that portion no longer retains any riparian rights." P. 841.

True the patentee could have mentioned the river as the south

boundary of the lots in the deed by which he conveyed them or he could have bounded the lots by a street, alley or other monument. In such event the deed would have carried title to the center of· the stream, to the center of the street, to the center of the alley or to the center of the monument mentioned, as the case may have been. This rule is said to be based upon the principle that the legal terminus of a boundary by a monument is the central point of the monument. This rule, however, has no application whatever where, as here, the boundary is a definite fixed, surveyed and measured mathematical *line*. Such *line* has only length,—it is wholly without breadth, width or thickness and therefore wholly without a center.

In 6 Thompson on Real Property, Perm. Ed., it is said: "A conveyance of land according to a plat or by government subdivisions carries all the land lying within the lines so run and platted." P. 577, note 51. Again: "Where the deed describes the land by reference to a plat or map, the grantee takes in accordance with the boundaries so identified." P. 579, sec. 3373, note 69.

In his brief in this court the defendant Bakke says: "Those of the court who are familiar with the Higgins Avenue Bridge in Missoula will recall that the river separates into the north and south channel a few hundred feet east of the bridge, leaving an island under the center of the bridge." We recall that such conditions obtain. But our familiarity with the scene also causes us to recall that the Higgins Avenue Bridge, spanning the river to the east of block 56 of W. J. McCormick's Addition, and the Parkway Bridge, spanning the river to the west of lots 9 to 14 in said block 56, both have their approaches on the elevated "nearly level" bench lands mentioned in the government field notes of 1870 as being located both to the south and to the north of the river, and that it was on such bench 20 or more feet above the ordinary level of the waters of · the river and above the high water mark of the river attained only at excessive flood stage that the patentee surveyed, laid out, platted and established his addition and dedicated to the

public Front street and the other streets located on such bench, the level of which is 18 or 20 feet higher than the level of the land here in dispute. The record is barren of any evidence showing that the waters of the river, even at flood time rise beyond the line fixed and platted by the patentee as the south boundary line of said lots, which line was apparently surveyed and platted along the rim of the benchland and above high water mark on land whereon a purchaser could build in safety and without fear of having his improvements swept away by the river at flood stage.

The facts in Hess v. Merrell, 1947, Cal. App., 178 Pac. (2d) 467, 469, are in many respects quite similar to those in the case at bar. The Hess case, supra, involved a boundary line dispute between the owners of two lots of a platted subdivision through which Wahtoke Creek, a non-navigable stream flowed. The division line between lots 16 and 28 thereof was shown on the plat as a meander line running near the edge of a bench or upland before it breaks downward to reach the level of the bed of the creek. During ordinary flow the stream was about 20 feet wide but during high water it sometimes reached a width of 60 feet. The ground levels were about 25 feet above the bottom of the creek. The flow of the creek did not approach the crest of the banks or the countryside level north and south of the depression in which the stream flowed. The southerly line of the ordinary flow of the creek between lots 16 and 28 varied between one and two hundred feet from the crest on which runs the boundary line between lots 16 and 28. The land between such boundary line and the stream sloped downwards towards the stream and was the property in dispute, the defendants claiming the land lying between the actual north boundary line of lot 28 and the center or thread of the stream, basing their claim upon: (1) Adverse possession, (2) agreed boundary line, and (3) riparian rights to the center of the stream.

In denying defendants' claims and affirming the judgment for plaintiffs, the appellate court said: ''There was no such uncertainty as to the true boundary line proved in the instant

case. * * * This map clearly showed the true boundary line and that it did not run along the thread of Wahtoke Creek but was distant southerly from it. * * * There is no merit in the contention that the northerly boundary line of defendants' property is the thread of Wahtoke Creek. * * * Section 830 of the Civil Code provides in effect that where the land borders on a non-navigable stream it takes to its center unless the grant indicates. a different intent. As we have already observed, defendants' property did not border on the creek but was separated from it by a substantial strip of land. * * * Therefore the intent to make the marked boundary, and not the stream, the northerly boundary of Lot 28 is evident from the grant under which the land is held.''

In Kenyon v. Knipe, 2 Wash. 394, 27 Pac. 227, 13 L. R. A. 142, at page 145, the court said: ''A deed conveying property by reference to a plat, or map thereof, adopts such plat or map as a part of such deed, and one purchasing thereunder becomes bound by the boundaries of the lot purchased as they appear on said plat or map. Applying this rule to the case at bar, it will be seen that the plaintiff herein did not purchase lots bounded by tide-water, but those bounded by a definite and defined line 120 feet from the front of said lots, so that the lots he purchased were bounded and concluded on the one side by Front Street, and on the other side by the alley next westerly thereof, and we think he is estopped by such fact from claiming any rights beyond such boundaries as against the rights of the public in said alley, and of those in possession of the lots beyond such alley. Unaided by such plat, his deed is uncertain and void. Aided by it, it becomes a valid deed, but of a lot with definite boundaries, and he must be bound thereby.''

The Kenyon case, supra, is approved in Hansen v. Lindstrom, 168 Wash. 130, 11 Pac. (2d) 232, at page 235, and followed in Menstell et al. v. Johnson et al., 125 Or. 150, 262 Pac. 853, 266 Pac. 891, 897, 57 A. L. R. 311. See also subdiv. 6 of sec. 10683, Rev. Codes of Montana 1935; Cook v. McClure, 58 N. Y. 437, 17

Am. Rep. 270; Greenspan v. Yaple, Sup., 189 N. Y. S. 115, 118; Hutton v. Yolo Orchard Co., 203 Cal. 724, 265 Pac. 933.

Kelly v. King, 225 N. C. 709, 36 S. E. (2d) 220, 221, 223, involved the title and boundaries of certain artificially made land built by dredging along a non-navigable stream or sound upon which land so built and reclaimed a road had been laid out and a town hall erected. There were numerous plaintiffs all being lot owners who claimed that their lots extend to the center or thread of the channel of the stream. The various deeds on which they base their respective claims of title are all differently worded. In one case the lot was described as lot 4 in block 14, according to official map or plan of a part of Carolina Beach prepared by Becton and Humphrey, C. E. "reference being had to said map or plan for a complete description of the lot herein conveyed." In another case the lot was described as "Lot No. 9 in Block 8, as shown by the official map and plan of Carolina Beach as surveyed, platted and mapped by J. L. Becton, C. E." and in another case the lot was described as lot No. 1 in block 6, "according to the original map of Carolina Beach Northern Extension," and extending westwardly from Carolina Beach Avenue north 125 feet "to the low water mark of Myrtle Grove Sound." In affirming a judgment of nonsuit and holding the plaintiff's evidence insufficient to establish their claims, the appellate court said:

"While the general rule is that description of land as bordering on a non-navigable stream carries to the thread of the stream, Rose v. Franklin, 216 N. C. 289, 4 S. E. (2d) 876; Wall v. Wall, 142 N. C. 387, 55 S. E. 283, this is rebutted by words which clearly restrict the grant to the edge or shore of the stream. 8 A. J. 762, 11 C. J. S., Boundaries, sec. 31, page 577. It was held in Rowe v. Lumber Co., 128 N. C. 301, 38 S. E. 896, and reaffirmed with modification in Rowe v. Lumber Co., 133 N. C. 433, 45 S. E. 830, that where the call is to a point on the margin of a swamp and thence along the swamp, the common law rule which carries the riparian owner's title to the thread of the stream does not apply. * * * We think the description 'to

the high water mark' of a non-navigable arm of the sea, a broad shallow sound, such as is here disclosed by the evidence, restricts or limits the conveyance to the correctly located line of mean high water as indicated on the ground. 8 A. J. 757, 11 C. J. S., Boundaries, sec. 31, page 576. * * * Nor is it to be presumed that plaintiff's grantors intended to convey land beneath the waters of the Sound. Patapsco Guano Co. v. Lumber Co., 146 N. C. 187, 59 S. E. 538, 13 L. R. A., N. S. 318, 125 Am. St. Rep. 473; Niles v. Cedar Point Club, 175 U. S. 300, 20 S. Ct. 124, 44 L. Ed. 171. * * *

"It seems to have been established by numerous decisions of this Court that where lots are sold by reference to a recorded plat, the effect of reference to the plat is to incorporate it in the deed as a part of the description of the land conveyed. Elizabeth City v. Commander, 176 N. C. 26, 96 S. E. 736. As was said in Collins v. Land Co., 128 N. C. 563, 39 S. E. 21, 22, 83 Am. St. Rep. 720, 'a map or plat, referred to in a deed, becomes a part of the deed as if it were written therein.' Home Real Estate Loan & Ins. Co. v. Carolina Beach, 216 N. C. 778, 7 S. E. (2d) 13; Pearson v. Allen, 151 Mass. 79, 23 N. E. 731, 21 Am. St. Rep. 426. 'Where the deed contains two descriptions, one by metes and bounds, and the other by lot and block according to a certain plat or map, the controlling description is the lot according to the plan, rather than the one by metes and bounds. Nash v. [Wilmington & W.] R. R. Co. 67 N. C. 413.' Hayden v. Hayden, 178 N. C. 259, 100 S. E. 515, 516, 130 A. L. R. 643, note. Applying these principles to the evidence in this case, it follows that the high water mark of the Sound must be regarded as the western boundary of all of the lots of the plaintiffs.''

In City of St. Louis v. Missouri-Pacific Railroad Co., 114 Mo. 13, 21 S. W. 202 at page 206, it is said: "Old decisions, and all those we have seen in this state on the subject, declare our law to be that where a city lot is separated from the river by a street, owned in fee by the public, (or in trust for the public, as in this case), the proprietor of the lot is not entitled to

the alluvion formed upon the street opposite the lot. This proposition must now be considered settled." Among the authorities relied upon was City of St. Louis v. Lemp, 93 Mo. 477, 6 S. W. 344. Both the Lemp case, supra, and the Missouri-Pacific R. R. Co. case, supra, were cited with approval in the later case of American Steel & Wire Co. v. City of St. Louis, 354 Mo. 692, 190 S. W. (2d) 919.

In Smith v. St. Louis Public Schools, 30 Mo. 290, it was held that the doctrine of accretion was inapplicable to such tracts of land as have a definite, fixed boundary line other than the river and that where a street was dedicated to the public between a lot and the river the right of accretion did not attach to the lot and that the street fixed the boundary of the lot.

Ellinger v. Missouri-Pacific R. R. Co., 112 Mo. 525, 20 S. W. 800, holds that the owner of a lot bounded on one side by a street located along the river was not entitled to accretions formed on the opposite side of the street, saying: "The limit of the boundary in the direction of the river by an intervening street prevents the proprietor from claiming the alluvion."

In Sweringen v. St. Louis, 151 Mo. 348, 52 S. W. 346, 349, the boundary of a tract of land was described by courses and distances, metes and monuments, by the high and low water mark, and it was held that the owner of the tract had no accretion right.

The recent case of State ex rel. Highway Commission v. Esselman, 1944, Mo. App., 179 S. W. (2d) 749, 751, holds that "to give the owner of a tract of land the right to accretions, the river or stream—not courses or distances, metes or monuments —must be made the boundary. The one is a changing boundary, the other is a fixed boundary which limits the field."

In Tyler v. Gonzales, 1945, Tex. Civ. App., 189 S. W. (2d) 519, 521, it is said: "When a boundary of a tract is fixed at a river or stream the laws relating to erosion and accretion are applicable thereto, and the boundary changes with the stream. 7 Tex. Jur. 138, sec. 20. However, the law is otherwise when the boundary is not a stream or river. The applicable rule is

that the lines of a survey as originally run are its boundaries. Roberts v. Hart, Tex. Civ. App., 165 S. W. 473. When Gresham conveyed the 264-acre tract to Hill he did not intend that the boundary line between the conveyed tract and the 56-acre tract which he retained should be San Miguel Creek. He plainly established another line by the description in the deed.''

In Sage v. Mayor of the City of New York, 154 N. Y. 61, 47 N. E. 1096, 1103, 38 L. R. A. 606, 61 Am. St. Rep. 592, it is said: ''The doctrine of accretion rests upon an increase by imperceptible degrees through natural causes, such as the ordinary action of water. It does not apply to land reclaimed by man through filling in land once under water, and making it dry. Mulry v. Norton, 100 N. Y. 424, 432, 3 N. E. 581 [53 Am. Rep. 206]; Halsey v. McCormick, 18 N. Y. 147; Ang. Tide Waters, 71; 1 Am. & Eng. Enc. Law (2d Ed.) 467. The city was not a wrongdoer in filling up the water front and constructing piers * * * The land thus made, without trespassing upon the rights of any one, did not become the property of the plaintiff through accretion, but remained the property of the city for the benefit of the public as dry land, just the same as when it was land under water.''

In Hunzicker v. Kleeden, 161 Okl. 102, 17 Pac. (2d) 384, 386, the court held that where land adjoining plaintiffs' lots had been washed away by a river so that the lots became riparian lands but thereafter the river abandoned its channel along the lots, that the owners of the lots did not acquire title to the middle of the river bed as riparian owners and that plaintiffs' boundary was capable of determination and that they acquired no more land than was contained in their lots as originally platted. In that case the court said: ''In the case at bar, plaintiffs' land was certain definite lots, capable of being ascertained in accordance with the surveys of said lots. When the river receded, the exact amount of land belonging to plaintiffs could be determined and located, and such land as existed beyond the boundaries of plaintiffs' land was not plaintiffs' land

by right of accretion, but continued to be the land of the original owners thereof.

"The original owners of the river bed had a right to the river bed which had never been sold or conveyed away, and, so long as they retained their right in and to said property, they were entitled to prevail as against plaintiffs' contention that the title in and to said property was vested in them."

In the case at bar the original owner of the fee simple title to the river bed and to the lands at either side thereof was the patentee Washington J. McCormick. While he conveyed certain lots within the boundaries of his addition located on the beach to the north of the river as shown by his plat, yet there is no evidence whatever that he at any time ever sold or conveyed away any of the lands to the south of said addition or to any part or portion of the river bed.

The majority opinion quotes from 56 Am. Jur., Waters, p. 733, sec. 280, to the effect that "The majority of courts have followed the rule that land which is separated from water by a highway or street, the fee of which is in the public is not riparian land; but where the fee in the land covered by the highway or street is in the owner of land, riparian rights remain in such owner." This is the rule for which the city of Missoula has contended for the reason that Bakke's six lots fronting on Front street to the north are separated from the water by a strip of land to the south used as a public alley and the fee of which is in the public. Defendant's lots, according to the plat, lie to the north of the alley while all the lands which the city here claims lie to the south of the alley and between it and the river. The fee to the land covered by the alley being in the city and not in Bakke, under the above rule, no riparian rights attached to Bakke's lots at the time of the conveyances to Bakke and his predecessor Follman.

The majority opinion states that, "The record in this case contains a stipulation that the lots in question abut on what is now called the Missoula river; that the water of the river actually goes to the edge of the land and that there is no land

intervening between said lots and the river.'' This is most inaccurate for, as above pointed out, the so-called ''stipulation'' was merely as to what the tracing of the plat, which had not yet been prepared, would *show* with respect to the platted lands as of September 1882 when the original plat thereof was made and not as to conditions existing in 1936 or in 1944 when Follman and Bakke received their respective deeds to the described lots. The above also conflicts with the statement in the majority opinion that, ''The alley 'severed' the McCormick land north of the alley from that south of the alley,'' and the statement that it was stipulated that the plat, exhibit 4, ''showed facts (namely, that the lots extended to the middle of the river) indicating that the * * * river was actually the south boundary of the lots.'' The channel and shores of the river in 1882 when the plat was made were not then located at the same places which they occupied almost half a century later (1930) when the Kate H. McCormick estate conveyed the alley to the city.

The majority opinion also cites and relies upon Ennis v. Grover, 53 Misc. 66, 103 N. Y. S. 1088; Prior v. Comstock, 17 R. I. 1, 19 A. 1079, and Municipality No. 2 v. Orleans Cotton Press, 18 La. 122, 36 Am. Dec. 624. These cases are clearly not in point. The Ennis case, supra, only involves an easement and not the fee to the right of way and the deed there involved, by appropriate language, also granted all the wharfage rights lying in front of the land conveyed. The deed to Follman contained no such provision and the deed to the city conveyed the fee. 16 Am. Jur., pp. 624, 625. In the Prior case, supra, it was held that the city did not grant to the railway company the land there claimed by it and that had there been a grant it would only have been of an easement and not of the fee as here. The Orleans Cotton Press case, supra, involved the construction of certain French laws governing transactions occurring in the year 1805 and turns upon the question of whether or not there had been a dedication of the property to a public use, the court holding that there had been no such dedication. In the case at bar the Kate H. McCormick estate and other grantors therein

named by their deed expressly dedicated the alley to public use. Upon such facts as obtain in the instant case, it is evident from what the Louisiana court said that it would have reached the opposite conclusion which would be in line with the city's contentions herein.

The majority opinion also comments on the fact that Follman declined to give a deed to the city of lands involved. The city engineer's request for such deed is certainly not an admission that the city did not then have title by adverse possession and by the two deeds given it by the estate of Kate H. McCormick, deceased. The city was desirous of avoiding trouble, misunderstanding and costly litigation with its citizens and in seeking a quitclaim deed from Follman it was but pursuing the same general course followed with respect to all the other owners of property located along Front street. That Follman declined to give a deed or that at times he may have trespassed on the city's lands or attempted to authorize others to do so does not defeat the city's title by adverse possession or by deed to such lands.

For a quarter of a century or more the city has been engaged in protecting the property of its residents having lots along the south side of Front street by building costly concrete sea walls and by building up the lands to the south of the McCormick Addition according to the original plat thereof. After building up and making such lands the city saw other possibilities therefor than merely as a deflection of the course of the river and a protection for the real estate to the north. Accordingly, it acquired the fee simple title to the strip of land on which it established a public alley and it then set about obtaining a deed for and grading, leveling, beautifying and improving the lands lying between its said alley and the river with the view of building a public playground and park thereon for the use and enjoyment of everyone.

This is an equity case. Clearly the equities herein are with the city which has spent many years and much money in building, improving and beautifying the lands and not with the de-

fendant who acquired his lots on Front street with full knowledge of the use which the city had made and intended to make of its lands to the south of the alley and who had owned his lots but a few months when this action was commenced. By interfering with the training of the city's firemen and their use of the city's drill tower located on the lands claimed by the city, the defendant precipitated this suit.

Bakke bought his six lots according to the original plat thereof which shows each boundary line of the lots and which shows the south boundary *line* thereof at no greater distance than 90 feet from the south boundary *line* of Front street and there, according to the plat, his property ends.

At one time the rimrocks on the bench to the north of the Yellowstone river and to the north of the city limits of Billings, Montana, marked the banks of the Yellowstone river whose action cut a bed to the south thereof. Since then the city of Billings has been built on the flats below the rim of the bench and between such rim and the river, which at flood stage has many times been known to overflow its ordinary banks and flow toward the rimrocks. Because of this would anyone contend that the owner of property on the bench whose survey lines came to the edge of the rimrocks has riparian rights which entitle him to the land lying between the rimrocks and the center or thread of the river? Could the owner of lands which end at the rim of the bench above the city of Billings claim riparian rights entitling him to claim the county courthouse, city hall and the various business and residence properties located on the flat land between the rim of the bench and the river?

How then may the defendant Bakke claim that in 1936 when his predecessor purchased or in 1944 when he purchased, according to the plat, that his lots were then riparian or that the south boundary thereof extends beyond and *without* the bounds and limits of McCormick's addition to the thread of the Missoula river, hundreds of feet to the south of the lines drawn on the plat to indicate the south limits of the platted property?

The plat made by the original patentee in 1882 fixed survey lines marked on land *within* the addition and represented on the plat as the boundaries thereof and not the changeable shores, channels, threads of streams, islands or rivers located *without* and beyond the limits and bounds of the platted addition. Bakke's deed gives him title to the six described lots *within* the platted addition but such deed passes no title to the city's lands situate wholly *without* such platted addition.

Rehearing denied November 10, 1948.