## FITZSIMMONS v. CASSITY.*
### No. 5396.

Court of Appeal of Louisiana. Second Circuit.

March 1, 1937.

Pugh, Grimmet & Boatner and Frank J. Looney, all of Shreveport, for appellant.

Hunter & Hunter and Elmo P. Lee, Sr., all of Shreveport, for appellee.

TALIAFERRO, Judge.

Plaintiff, under appropriate allegations, instituted this possessory action against S. G. Cassity, a resident of Caddo parish, La., wherein he avers himself to be the owner, and as such in the physical and peaceful possession, of the following described property situate and being in the parish of Bossier, to wit:

*Rehearing denied April 1, 1937.

"All that part or portion of South Half of Section 12, South Half of Section 11, North Half of Section 14, North Half of Section 13, in Township 19 North, Range 14 West, Bossier Parish, Louisiana, which lies North of the following South boundary line, to-wit:

"Beginning at a point 283 feet South of the common corners of Sections 10, 11, 14 and 15 T. 19, N., R. 14 West, thence South 54 degrees, 46 minutes East 626.54 feet, thence South 54 degrees, 45 minutes East 1140.90 feet, thence South 48 degrees, 17 minutes East, 1336.47 feet, thence South 81 degrees 51 minutes East, 824.01 feet, thence North 86 degrees 22 minutes East, 749.29 feet, thence South 25 degrees 50 minutes East, 230.87 feet, thence South one degree 19 minutes West, 187.55 feet, thence North 78 degrees no minutes East, 1903.30 feet, to the bank of Red River as the same is now located, together with all the batture, accretion and riparian rights appertaining thereto, as will be more fully shown and described in that certain judgment rendered by this Honorable Court on the 27th day of October, 1932, recorded in Conveyance Book 107, Page 415 of the records of Bossier Parish, Louisiana, a certified copy of which judgment is hereto annexed and made a part of this petition, and as more fully shown by deed of date May 17th, 1928, duly recorded in Conveyance Book 97, Page 141 of the Conveyance Records of Bossier Parish, Louisiana."

He avers that the boundaries of his land have been and are now definitely located and established by the judgment referred to, as well as by actual survey by competent civil engineers. He further avers that defendant has unlawfully entered upon said land, cut trees therefrom, and has erected an artificial duck blind thereon which has been, and is being, used by him, his agents and employees, for duck hunting purposes, thereby disturbing and interfering with petitioner's possession of the land and the use and occupancy thereof; that he has repeatedly demanded of defendant, his agents and employees, that they cease interfering with and disturbing his said possession and right of occupancy, without success; but, on the contrary, they persist therein. To restrain them from so doing, a rule was sued out against defendant only to show cause why a preliminary injunction should not issue. The rule was continued by consent, and referred to the merits. A permanent injunction is prayed for.

In limine, defendant excepted to the court's jurisdiction ratione materiæ. The exception was referred to the merits, without prejudice.

Answering, defendant denies that the land described in the petition is situated in Bossier parish, and denies that plaintiff is the owner or in possession of same, in so far as said description includes any part or portion of that body of water and bed thereof known as "Old River" or "Old River Lake," and in so far as said description covers and includes any part or portion of section 13, township 19 north, range 14 west. He avers that plaintiff's ownership and possession are confined to lands embraced in the description in the deed to him from James M. Bird, of date May 17, 1928, which is referred to in the petition. He admits erection of the artificial duck blind on said "Old River" or "Old River Lake" and that he used it during duck hunting seasons. He further pleads:

"8. Further answering, defendant shows that that body of water known and described as 'Old River' or 'Old River Lake' was a part of a navigable body of water at the time of the admission of the State of Louisiana to the Union in 1812, and said water and the bed thereof is the property of the State of Louisiana by virtue of its sovereignty.

"9. In the alternative, defendant shows that if said Old River or Old River Lake was not a part of a navigable body of water at the time of the admission of the State of Louisiana to the Union in 1812, then said Old River or Old River Lake became part of a navigable body of water at a time subsequent to 1812, and that the State of Louisiana became the owner thereof by virtue of such navigability.

"10. Further in the alternative, defendant shows that if it be found that said Old River or Old River Lake was not navigable at the time of the admission of the State of Louisiana to the Union in 1812 and that it has not been navigable since that time, then the waters of Old River or Old River Lake and the bed thereof were not under the direct ownership of any person, firm or corporation at the time of the enactment of Act No. 258 of 1910 of the Legislature of Louisiana, and the State of Louisiana acquired the ownership of the waters of Old River or Old River Lake and the bed thereof by virtue of the provisions of said act."

And he finally prays that plaintiff's suit be dismissed and his demands rejected.

The plea to the court's jurisdiction was overruled, and judgment was rendered for plaintiff as prayed for. Defendant appealed.

The basis of the exception to the jurisdiction, as well as the questions raised on the merits, may the better be understood when studied in conjunction with the government plat of 1839 of the locus in quo. We here insert a copy of said plat:

lowing the removal of the great raft in Red river above the city of Shreveport about the year 1873, the waters of the river, during high stages, which on account of the raft to a large extent had been diverted through collateral channels, returned to the river's main stem. This naturally produced a material increase in the current's velocity. Gradually, though surely, the river on the north side of the

The sections included in this map, together with others of the township, were resurveyed by United States engineers in 1872. The plat made pursuant to this survey discloses, in the interim, no extensive changes in the course of Red river as it traverses said sections.

For convenience we shall herein refer to the body of land composed of those portions of sections 11, 12, 13, and 14 in the bend of the river as the "peninsula." According to the two first (government) surveys of this locality, the distance between points "A" and "B" on the above map was approximately 2,700 feet. Fol-

peninsula moved southerly, absorbing from time to time by erosion the acreage in the bend. As this advance progressed, by accretion, the area abandoned by the river, on its north and west sides, built up on a level, generally, and became suited for farming purposes. Its limits were and are coextensive with the bank of the abandoned river.

It was evident to all observers that insensibly, though definitely, the elimination of the river around the peninsula as a part of its active channel was in the making, and that of its own efforts the river would soon create for itself a new and

more direct channel across the then very narrow neck of land along the line between points "A" and "B."

It is well to add here that the river on the south and west sides of the peninsula underwent no large changes in location from 1873 to 1920. There were some shifts in the channel which we find of no special significance so far as this case is concerned.

In the year 1920, the distance between the two turns in the river (about the line between "A" and "B" on the map) had been reduced to 286 feet, and, realizing that this intervening barrier would soon disappear, the Levee Board having jurisdiction, for economic reasons, with the consent of the War Department, hastened its elimination by cutting a ditch or canal across the isthmus. The river thereafter adopted this route to its own uses and established thereon a new channel which it follows at the present time, though much wider than the original cut. Concurrent with this action of the river, the original channel around the peninsula was abandoned, became disconnected from the main stem of the river by a large intervening sand bar, and today is what is referred to in pleading and testimony as "Old River" and "Old River Lake."

The duck blind in controversy is located on the fractional S. E. ¼ of N. W. ¼ of section 13, township 19 north, range 14 west, shaded and shown on the map to contain 29.60 acres. Prior to 1873 this tract of 29.60 acres was land in place, and we are convinced from the testimony bearing thereon that by 1920 the river had encroached upon and embraced within its banks more than the northern half of the tract. The duck blind in question is located in what was formerly the active river. This fact is established by the testimony of Engineers Lombard and Evans, the former for defendant, the latter for plaintiff. The sand bar between the present river and the two ends of the abandoned part of the river bed serves to impound water of sufficient depth in the "Old River" to cover a part of said 29.60-acre tract and tracts adjacent, forming a shallow lake called "Gold Point Lake," as a sort of adjunct and connection to the ends of the abandoned river. The duck blind is situated in this shallow lake, approximately 100 feet from the shore line; but for the sand bar this lake would drain dry into the river. The depth of water in the lake is affected by the seasons and by rainfall.

It has no connection whatever with the river.

The parish of Caddo was created by Act No. 15 of the Legislature of 1838. Section 1 thereof defines the boundaries of the new parish. Red river is definitely fixed as its eastern boundary. That means, of course, the river as it was located and ran at that date. The parish of Bossier was created by Act No. 33 of 1843. This parish was carved from the then existing parish of Claiborne, and Red river is given as its western boundary. The center of the river became the common boundary line between the parishes and the jurisdiction of each stopped at that line. In this connection, the opinion of the court in Parish of Caddo v. Parish of Bossier, 164 La. 378, 113 So. 882, 885, is interesting reading. It is said therein: "Our conclusion is that the Legislature in designating Red river as one of the boundaries of Caddo parish, and also of Bossier parish, meant Red river as it then ran, and not its original channel, or what is now known in that vicinity as Old river."

The land whereon the duck blind is situated was east of the river when Bossier parish was created, and therefore became a part of that parish. As the river presently runs, this land is west of the river. Defendant contends, in support of his plea to the court's jurisdiction, that since the river has changed its course, in the respect above discussed, that this action on its part superinduced a change in the boundary line between the two parishes, and that the situs of the blind is now a part of Caddo parish. We do not think this position tenable. If this were true, and the seat of government of Bossier parish had been on the peninsula, that parish would be without that indispensable attribute of government, while Caddo parish would possess two. To extend this line of argument further, a parish would lose its identity as such if a boundary river should adopt a new channel by cutting through and bisecting its territory. Boundary lines of a parish are definitely fixed by legislative enactment when created. They may only be changed or altered by pursuing the method pointed out by law. Section 2 of article 14 of the Constitution of 1921. If this were not true, parish lines would fluctuate with the vicissitudes of boundary streams. If defendant's contentions were true, should the river resume its former channel, the

land involved would again become part of Bossier parish. This would be an absurd result.

Defendant cites and quotes from the following cases to sustain his plea: Nebraska v. Iowa, 143 U.S. 359, 12 S.Ct. 396, 36 L.Ed. 186; Alabama v. Georgia, 23 How. 505, 16 L.Ed. 556; Myers v. Perry, 1 La.Ann. 372; McBaine v. Johnson, 155 Mo. 191, 55 S.W. 1031; Blair v. United States (C.C.A.) 32 F.(2d) 130.

All these cases involved boundary lines between states, and are not applicable to facts such as we have in the instant case. The courts' holdings in some of the cases are not inconsistent with the views we herein express. We are of the opinion that the plea to the jurisdiction was properly overruled. The locus of the duck blind is in Bossier parish.

■ Plaintiff purchased "Gold Point Plantation" in May, 1928, and went into physical possession of it in January, 1929. In addition to specifically described tracts of land in sections 2, 10, 11, and 14, township 19 north, range 14 west, there was conveyed to him all the alluvion, accretion, and batture next to, adjoining, or abutting said tracts, even though same should extend into other sections. No part of section 13 is specifically described in the deed to him from Bird, but the testimony definitely establishes that long before the river changed its course in 1920, the fractional S. E. ¼ of N. W. ¼ of section 13 formed a part of the plantation as well as the other tracts within the limits of the peninsula. It is so considered at the present time. Therefore, when plaintiff took possession of the plantation in 1929, that possession embraced each and every parcel of land included within its bounds; and this is true of the fractional S. E. ¼ of N. W. ¼ of section 13, although partially covered by the waters of "Gold Point Lake."

In the year 1932, A. G. Slagill and J. M. Bird, owners of lands in what was formerly the peninsula, instituted a suit in the district court of Bossier parish, against H. A. Fitzsimmons, plaintiff here, presumably petitory in character, wherein was involved the ownership and possession of the northern half of that part of the abandoned river on the north side of the peninsula in 1920. There is in the record before us a copy of the judgment rendered in that case. It was not appealed from and now is final. In this judgment

the demands of plaintiffs were rejected and Fitzsimmons was recognized as the owner and in possession of all those parts and portions of the south half of section 12, south half of section 11, north half of section 14, north half of section 13, in township 19 north, range 14 west, which lie north of the traverse line through the center of said abandoned river and on to the west bank of the present river, described in plaintiff's petition in the present suit and reproduced in the statement of the case in the beginning of this opinion. This traverse line was established, presumably, while that case was pending, by a competent civil engineer, and its course marked by high iron pipes driven into the ground beneath the water. The duck blind, beyond question, is situated on the north side of this traverse line.

■■ Defendant asserts no proprietary interest in the land where the blind is located; nor does he claim authority from any one for the possession he has exercised thereover. He pleads that the land is owned by the state of Louisiana by virtue of its sovereignty, and therefore may be freely used by the public, citing article 453 of the Civil Code which supports that position as regards beds of rivers, etc. Plaintiff contends that, whatever may have happened to affect the ownership of his author in title to the land, following shifts in the river's channel prior to 1920, when the new channel was adopted that year, and the old one abandoned, under the provisions of article 518 of the Civil Code, the bed of the former river automatically became the property of the owner of the land (his vendor) which was absorbed by the new channel, and passed to him (plaintiff) by the deed from Bird. We concur in this position. Article 518 reads as follows:

"If a river or stream, whether navigable or not, opens itself a new bed by leaving its former channel, the owners of the soil newly occupied shall take, by way of indemnification, the former bed of the river, every one in proportion to the quantity of land he has lost.

"They shall again take their former property, if the river or stream returns to its former channel."

We presume this codal provision was deemed by the court controlling in the case of Slagill & Bird v. Fitzsimmons, above referred to.

The underlying philosophy, as well as the equitable effect of appropriate applica-

tion of this article, is obvious. The state has no right to acquire private property and not compensate the owner therefor. The beds of rivers, it is conceded, belong to the state in its sovereign right. Therefore, when a river changes its course and for this purpose appropriates private property for its new bed, the lawmaker, out of a spirit of justice and fairness, has wisely ordained, in effect, that the owner of the appropriated land shall be compensated for his loss by becoming the owner of the abandoned bed. All persons who acquire property adjacent to navigable streams are impressed with knowledge of the existence of this law and, of course, the sovereign, the source of the law, is bound by it. In this connection the case of State v. Richardson, 140 La. 329, 354, 72 So. 984, is illuminating.

It is the general rule that in a possessory action inquiry into titles is limited to the nature and extent of possession thereunder. Code of Practice, art. 53; Moran v. City of New Orleans, 170 La. 499, 128 So. 290; Williams et al. v. Harmanson, 41 La.Ann. 702, 6 So. 604. And it was held in Grant Timber Co. v. Gray, 131 La. 865, 868, 60 So. 374, 376, that: "It is immaterial how ownership may have been acquired, provided it is in one of the methods recognized by law. If the owner's possession of the property has been disturbed, he may bring the possessory action against the trespasser and be reinstated in possession without proving title to the property." This case was carried to the United States Supreme Court and there affirmed. 236 U.S. 133, 35 S.Ct. 279, 59 L.Ed. 501.

The rule was greatly extended in Depassau v. Winter, 7 La. 1; and in Gleisse & Holland v. Winter, 9 La. 149. In each of these cases defendant was barred from proving that the title of the property, the possession of which was in dispute, reposed in the public; the locus in quo, it appearing, being susceptible of private ownership. However, as regards property, the title to which is unquestionably in the public, and its free use admitted to all, we do not think the rule laid down in these two cases would apply.

It is contended that the abandoned part of the river is susceptible to navigation in fact and that for this reason its bed still belongs to the state. The water therein is deep enough for light craft to ply, but we do not think this fact alters the situation. The depth of the "Old River" has been reduced materially by silt from the Red river and partakes more of the character of a shallow lake than it does a navigable stream. Being disconnected from any navigable stream, and surrounded by plantation lands, it can serve no useful purpose commercially. Anyway, article 518 of the Civil Code makes no exceptions in conferring ownership of abandoned rivers on those whose land has been taken by the new channel.

It is also argued that article 518 of the Civil Code does not apply as the adoption of the new channel across the 286-foot neck was encouraged by the act of man. We do not think this tenable. It was certain the river was destined very soon to connect at this point and the cutting of the canal only accelerated this event a brief time. It remains that plaintiff's author's land was "taken" by the river without any act of his.

Defendant does not discuss Act No. 258 of 1910, mentioned in his answer. We assume that defense has been abandoned. We do not think the act has any application to the facts of this case.

We are of the opinion the judgment appealed from is correct, and it is hereby affirmed, with costs.