PRESTON v. ACME SAND & GRAVEL CO., Inc.

No. 5956.

Court of Appeal of Louisiana. Second Circuit.

Feb. 7, 1940.

Dickson & Denny, of Shreveport, for appellant.

Barksdale, Bullock, Warren, Clark & Van Hook, of Shreveport, for appellee.

TALIAFERRO, Judge.

Plaintiff's two sons, Leroy and Chester, aged respectively thirteen and eleven years, while playing in Red River between the new traffic bridge and that of the Illinois Central Railway Company, in the City of Shreveport, the afternoon of August 6, 1937, stepped into a deep hole and were drowned. Two other colored boys at the time had the same sad fate. The river then was at low stage.

Defendant, the Acme Sand & Gravel Company, Inc., is engaged in mining and pumping sand for commercial purposes from the bed of Red River, and, at the time of the tragedy, held a permit from the War Department authorizing it to ply its trade between said bridges. To successfully conduct its operations, a fleet of boats and barges are maintained.

Plaintiff attributes the drowning of her sons to the negligence and carelessness of the defendant, and, in amplification, alleges:

That the boys were playing in water not over two feet deep on a sand bar and without knowledge of the presence of the deep hole across the bar, waded into it; that said deep hole was near the west bank of the river and was made by defendant in the process of pumping sand; that no warning sign or other notice, apprising persons playing, bathing or swimming in the river in the proximity of said hole was given, and no watchman was there posted to protect unsuspecting persons from falling therein.

Plaintiff sues for damages for the loss of expectant support, the companionship, affection, etc., of the boys.

Defendant denies that the hole in which the boys drowned was made by it, and even if it did so, avers that no negligence may be properly charged to it on that account. In the alternative, contributory negligence of the boys is pleaded as a bar to their mother's recovery.

Plaintiff's demands were rejected and after unsuccessful effort for rehearing, she appealed to this court.

The lower court on the primary issue in the case,—to-wit: Was the hole created by defendant?—specifically held that the testimony conclusively negatived that it did so. In denying the application for rehearing, written reasons therefor and for judgment were given. These are incorporated in the record. A close study of the testimony in the case impels us, with little or no hesitancy, to the same conclusion.

Defendant contends that the hole wherein the boys drowned was simply the creation of the whirling waters of the river at a higher stage. This river, it is shown and generally known, in most respects, is the most treacherous in this part of the country. Its ability to shift channel, create new channels, cut into one side and recede from the other, scour deep holes and to form sand bars, is notorious. See Fitzsimmons v. Cassity, La.App., 172 So. 824. Heavy rainfalls over its watershed in the proximity of and north of the City of Shreveport, when at low stage, quickly produces marked increase there in the river's depth, accompanied by swift current, whirlpools and augmentation of its scouring power. After the stream has subsided and low stage is again resumed, it frequently happens that the physical features of sections of the river between banks have undergone complete metamorphosis as compared with conditions at the same place or places prior to such rains. Holes in the river's bed are filled, new ones created, shallow places made deep and sand bars appear where the channel had been and in other respects the scene is entirely different.

Pumping sand is best accomplished when the river is at low stage. This sand is sucked into and through a pipe several inches in diameter, by centrifugal force, from deposits and unloaded into barges. As the sand is drawn up, naturally, a hole is created below the pipe, which necessitates the pipe being lowered as need therefor arises. This is repeated until the hole becomes several feet deep. The walls thereof are not perpendicular, but sloping. It is of funnel shape.

It is shown that the better deposits of clean sand are nearer the center of the river's bed. Deposits at or near the banks are apt to have, and generally do have, mud content, trash, etc., which materially affect its value for commercial purposes.

The river at Shreveport reached low stage approximately ninety days prior to the tragedy. Defendant's pumping equipment, etc., then was anchored near the

middle of the river, possibly nearer the east side, and mining continued until about July 1st. Heavy rains then caused a cessation of operations. The pumping equipment was brought to the west side of the river near the locus of the drowning, and there moored until the river had receded sufficiently to warrant resumption of operations.

On the day the boys drowned, defendant's equipment was at work about the same place it occupied prior to the interruption caused by said rains.

One witness for plaintiff is positive that before leaving the west bank, following the recession of the river, a large quantity of sand was pumped by defendant, which produced the hole wherein the drowning occurred. Another witness for plaintiff stated that he knew that sand was often pumped by defendant and others from deposits close to the banks, but did not testify that this particular hole was so created. Defendant's witnesses, five in number, are positive that defendant and others engaged in pumping sand for commercial purposes never attempt to take it within one hundred feet of the banks on account of mud content, trash and other things which affect its commercial value. These witnesses are equally positive that after the above described high stage of the river subsided, the entire pumping equipment was transferred directly to about the center of the river and anchored at the spot it occupied the date of the tragedy.

The hole in question begins eight feet from the bank of the river. It is ten or twelve feet deep, with walls almost perpendicular. Immediately north of it there is embedded in the bank at the water's edge, an old barge, and further out in the river, easterly, there is another discarded barge. The river's bank at the hole is composed of what is commonly referred to as "made land", which means that the land has been built up from time to time from silt deposits. It is a dumping place for old automobile bodies and parts, and for miscellaneous other metal substances. These oftentimes cave off into the river and become there embedded in its bottom. This is one reason why defendant's witnesses say that no sand was pumped there.

It is shown that when the river's current is obstructed by an object sufficient in size and attachment to check its flow, a hole or holes are scoured on the upper side of such obstacle and a bar created below. Defendant's explanation of the presence of the hole in question is that the two barges served to check the current during the recent high stage of the river, and, in keeping with its nature, the river "dug" the hole. Such action by Red River when at high stage is not at all improbable.

As regards the weight of the testimony of witnesses for each side, the lower court made this observation which we adopt, to-wit:

" * * * The Court is unable to say from the testimony that defendant made the hole in which plaintiff's children were drowned; neither does defendant's answer admit that it dredged this hole, although it admits that it dredged 'within the area' described by plaintiff, which is the bed of Red River between the bridges referred to, and having denied that it dug the particular hole, it remained for plaintiff to prove her allegations by a preponderance of the testimony, which we find she has failed to do.

"We further conclude that plaintiff's witnesses were not in as good a position to judge as to a particular point in the river as defendant's witnesses. The former were not particularly interested in exact locations, because they were fishermen or casual visitors along the river; while defendant's witnesses were required to find proper sand bars and to know the character of the river bed and then did the actual work of dredging, hence, were in a better position to testify as to exact locations, and did so. When a witness has testified that defendant dredged 'near the bank' on the west side of the river (and there are 1,200 feet of this bank), and another witness testifies that defendant did not dredge within 150 feet of a particular hole which is in contest (even though it admits having dredged near the bank on the west side), the former evidence cannot be considered as proving that defendant did dig the particular hole, when there is positive testimony that it did not.

"We adhere to our original opinion that plaintiff has not proven by a preponderance of the testimony that defendant dug the hole in which plaintiff's children were drowned, and for the reasons herein assigned the application for rehearing is overruled.

"Robert J. O'Neal
"Judge."

We are of the opinion that the lower court's judgment is correct. It is hereby affirmed.