J.P. FURLONG ENTERPRISES, INC., a North Dakota corporation, and Nantasket Petroleum Corporation, a Colorado corporation, David A. Papineau and Catherine Mary Papineau, Plaintiffs and Appellants,

v.

SUN EXPLORATION AND PRODUCTION COMPANY, a corporation; State of North Dakota; Grace M. Oyloe; Orville Oyloe; Ladd Petroleum Corporation, a corporation; R.E. Puckett; and Bruce P. Alfson, Defendants and Appellees.

Civ. No. 870075.

Supreme Court of North Dakota.

April 18, 1988.

Bjella, Neff, Rathert, Wahl & Eiken, P.C., Williston, for plaintiffs and appellants; argued by Fred C. Rathert.

Owen L. Anderson, University of North Dakota School of Law, University Station, Grand Forks, for plaintiffs and appellants.

Lawrence Bender, Asst. Atty. Gen., Bismarck, for defendant and appellee State of N.D.

Zuger, Kirmis, Bolinske & Smith, Bismarck, for defendant and appellee Sun Exploration and Production Co.; argued by Murray G. Sagsveen.

McIntee & Whisenand, P.C., Williston, for defendants and appellees Grace M. Oyloe and Orville Oyloe. No appearance by Fred E. Whisenand.

MESCHKE, Justice.

We consider whether a man-made change in the course of the navigable Missouri River affects ownership of oil and gas underlying the former riverbed. Applying a statute derived from Napoleonic and Roman law through the Field Code, we hold that it does. Therefore, we reverse a summary judgment declining to apply the statute.

## FACTS

In 1957, the United States of America acquired land by eminent domain in section 15, Township 152, Range 103, McKenzie County, from Emery Papineau. The condemnation decree stipulated that Papineau retained "all oil and gas rights."

After acquiring the land, the U.S. Corps of Engineers dug a large trench through section 15. The navigable Missouri River formed a new channel through the trench, leaving a long oxbow of former riverbed north of the new channel. Part of that oxbow is located in the NE¼ of section 9 of the same township.

Ladd Petroleum Corporation obtained an oil and gas lease, dated August 9, 1983, from the State of North Dakota for the oxbow riverbed in section 9. Sun Exploration and Production Company obtained an oil and gas lease, dated October 5, 1982, from Grace M. Oyloe on related lands adjoining the oxbow in section 9.

The oxbow riverbed in section 9 was also leased by Marc A. Chorney on September 16, 1983 from David A. Papineau as successor in interest of Emery Papineau. Chorney assigned this lease to J.P. Furlong Enterprises, Inc. and Nantasket Petroleum Corporation.

In November 1985, Sun drilled a producing oil and gas well in the NE¼ of section 9.

## THIS LITIGATION

Following completion of the oil well, Furlong, Nantasket, and Papineau ("Furlong plaintiffs") began this quiet title action against Sun, Ladd, Oyloes, State of North Dakota and several other associated mineral and royalty owners ("Sun defendants"). The Furlong plaintiffs claimed ownership of the oil and gas under the oxbow riverbed in section 9 and contended that the state owned the oil and gas beneath the new channel in section 15 on the basis of NDCC 47–06–07, which says:

> "*Ancient stream bed taken by owners of new course as indemnity.*—If a stream, navigable or not navigable, forms a new course abandoning its ancient bed, the owners of the land newly occupied take by way of indemnity the ancient bed abandoned, each in proportion to the land of which he has been deprived."

The Sun defendants took the position that NDCC 47–06–07 did not apply to artificial changes in the course of a navigable river and did not apply to the oxbow riverbed which still contained water. After preliminary discovery and motions, the trial court apparently declined to apply the statute, dismissed the Furlong complaint, and granted summary judgment to the Sun defendants.

The Furlong plaintiffs appealed, arguing that the plain meaning of NDCC 47–06–07, as well as historical objectives of it and connected sections, call for application of that statute to both natural and artificial changes in the course of a navigable river and to an abandoned riverbed that still contains some water.

The Sun defendants do not dispute either the history or the policy of NDCC 47–06–07, but urge that it should be applied only to natural changes, not to man-made changes, and that the oxbow is not an abandoned riverbed. They argue that Papineau does not need "indemnity" and therefore still owns the minerals under section 15. They further argue that laches and limitations support the summary judgment below and that the United States is a necessary party if the statute is applied.

The State of North Dakota argues that we should strictly construe NDCC 47–06–07 to protect the state's "sovereign lands" from "intrusion." Since Papineau was compensated by the United States for taking of his land in section 15, while being allowed to retain the underlying oil and gas, the State submits that he has not been deprived of anything by the river change, so indemnification under NDCC 47–06–07 is unnecessary. If the statute applies, the State further argues that the oxbow riverbed has not been "abandoned," leaving factual issues to be addressed upon remand.

## BACKGROUND

■ When North Dakota became a state, the beds of navigable waters, including that of the Missouri River, became state property by virtue of the equal footing doctrine. The purpose of state title was to protect the public right of navigation. *See Montana v. United States*, 450 U.S. 544, 551, 101 S.Ct. 1245, 1251, 67 L.Ed.2d 493 (1980) and *Pollard's Lessee v. Hagan*, 44 U.S. (3 How.) 212, 225, 11 L.Ed. 565 et seq. (1845) (at 229: "... to Alabama belong the navigable waters, and soils under them, ... subject to the rights surrendered by the constitution to the United States.") Thus, the State of North Dakota holds title to the bed of the Missouri River.[1] *See* NDCC 47–01–14[2] and 47–01–15.[3] This title includes underlying oil and gas. *State of North Dakota v. Andrus*, 506 F.Supp. 619 (D.N.D.1981), *aff'd*, 671 F.2d 271 (8th Cir. 1982), *rev'd on other grounds, sub nom. Block v. North Dakota*, 461 U.S. 273, 103 S.Ct. 1811, 75 L.Ed.2d 840 (1983), *on remand, sub nom. State of North Dakota v. Andrus*, 711 F.2d 118 (8th Cir.1983), *appeal after remand, sub nom. State of North Dakota v. Block*, 789 F.2d 1308 (8th Cir.1986). The Submerged Lands Act, § 3, 43 U.S.C. § 1311 (1976), reaffirmed the title of the states to lands beneath navigable waters at statehood, including "the natural resources within such lands and waters."

■ The Missouri River and the land adjoining it (*i.e.*, riparian land) are subject to the processes of accretion, erosion, avul-

---

**1.** Under the equal footing doctrine, a state's title to the beds of navigable waters can extend up to the ordinary high watermark, but is "governed by the local laws of the several States, ..." *Shively v. Bowlby*, 152 U.S. 1, 26, 40, 14 S.Ct. 548, 557, 563, 38 L.Ed. 331 (1894). Several states have limited their ownership of the beds of navigable waters to the area below the low watermark. *See* 1 Patton on Land Titles, §§ 138 and 297 (2d ed. 1957 and Supp.). Whether North Dakota has limited its title to the area below the low watermark has not been decided. *See* NDCC 47–01–15 and Note, 59 N.Dak.L.Rev. 211 (1983). As in our contempory decision, *In the Matter of the Ownership of the Bed of Devils Lake*, —— N.W.2d —— (Civil No. 870144), the trial court did not address that issue and we are not called upon to do so.

**2.** NDCC 47–01–14 says:
   *"Land below high watermark—Regulated by federal or state law.—*The ownership of land

below ordinary high watermark and of land below the water of a navigable lake or stream is regulated by the laws of the United States or by such laws as under authority thereof, the legislative assembly may enact."

**3.** NDCC 47–01–15 says:
   *"Banks and beds of streams—Boundary of ownership.—*Except when the grant under which the land is held indicates a different intent, the owner of the upland, when it borders on a navigable lake or stream, takes to the edge of the lake or stream at low watermark. All navigable rivers shall remain and be deemed public highways. In all cases when the opposite banks of any stream not navigable belong to different persons, the stream and the bed thereof shall become common to both."

sion, and reliction.[4] The consequences of these processes are addressed in NDCC Ch. 47–06.

In the event of accretion and reliction, any accreted or bared land "belongs to the owner of the bank, ..." NDCC 47–06–05.[5] This statute "is essentially a restatement of the well-established common law rule governing riparian rights;" *Hogue v. Bourgois*, 71 N.W.2d 47, 53 (N.D.1955). It generally follows the common-law rule that a riparian owner gains land by accretion and reliction and loses it by erosion. *See United States v. 11,993.32 Acres of Land*, 116 F.Supp. 671 (D.N.D.1953) (at 678: "[T]he general rule rests upon the equitable idea that a riparian owner should have the opportunity to gain by accretion since he is subject to the hazard of loss by erosion.") In two situations, however, this statute, which originates in the Field Code, does not follow common law.

The first situation is where land, originally surveyed as riparian, is submerged by encroaching river erosion causing land, originally surveyed as nonriparian, to become riparian. When the river shifts back, causing the land originally surveyed as ri-

parian to reemerge, this court, in construing NDCC 47–06–05, has held that title to the reemerging land rests with the owner of the original riparian land and not with the owner of the original non-riparian land.[6] *Perry v. Erling*, 132 N.W.2d 889, 897 (N.D.1965).

The second situation, where NDCC 47–06–05 apparently does not square with common law, concerns accretion, erosion, and reliction caused by the nonnatural shifting of a river. NDCC 47–06–05 begins with the phrase "[w]here from *natural* causes...." (Emphasis added). The word "natural" tends to indicate that this provision excludes from the general rule accretion and reliction resulting from artificial or man-made efforts. Thus, if a river shifts due to artificial or man-made efforts, the accreted or bared land may not belong "to the owner of the bank...." *See* Beck II at p. 449–50. At common law, the benefit of nonnatural accretion and nonnatural reliction went to the owner of the accreting bank, provided that the benefitted owner was not the primary contributor to the artificial or man-made effort that caused the accretion or reliction.[7]

---

**4.** "Accretion" refers to the gradual deposit and addition of soil along the bank of a waterbody caused by the gradual shift of the waterbody away from the accreting bank.

"Erosion" refers to the gradual loss of soil along the bank of a waterbody caused by the gradual encroachment of water into the eroding bank.

"Avulsion" refers to the sudden inundation or sweeping away of land resulting from a sudden change in the course of a waterbody.

Technically, "reliction" refers to the sudden baring of land resulting from a sudden change in the course of a waterbody. However, the word "reliction" is also commonly used to describe the gradual receding of water resulting in the gradual baring of previously submerged land. *See* n. 1, *In the Matter of the Ownership of the Bed of Devils Lake, supra.*

*See generally* Beck, *The Wandering Missouri River: A Study in Accretion Law*, 43 N.Dak.L. Rev. 429, 431 (1967) (hereafter cited as Beck II).

**5.** NDCC 47–06–05 says:

"*Riparian accretions.*—Where from natural causes land forms by imperceptible degrees upon the bank of a river or stream, navigable or not navigable, either by accumulation of material or by the recession of the stream, such land belongs to the owner of the bank,

subject to any existing right of way over the bank."

**6.** So has South Dakota, with an identical Field Code provision. *See Erickson v. Horlyk*, 48 S.D. 544, 205 N.W. 613, 614 (1925) and *Allard v. Curran*, 41 S.D. 73, 168 N.W. 761 (1918). Under the prevailing view, however, title to the reemerging land would rest with the owner of the land originally surveyed as nonriparian, in accordance with the common-law accretion rule. *See Wilcox v. Pinney*, 250 Iowa 1378, 98 N.W.2d 720 (1959). *See also* 2 Patton on Land Titles, § 303, p. 65 (cases cited at n. 89) (2d ed. 1957); Beck, *Boundary Litigation and Legislation in North Dakota*, 41 N.Dak.L.Rev. 424, 447 (1965) (hereafter cited as Beck I); and Beck II at 429–431 (cases cited at nn. 10, 11 & 12, p. 430).

**7.** *See* Annotation, *Riparian Owner's Right To New Land Created By Reliction Or By Accretion Influenced By Artificial Condition Not Produced By Such Owner*, 63 A.L.R.3d 249, 254–60 and 2 Patton on Land Titles, § 300, pp. 58–59, nn. 60 and 61 (2d ed. 1957). The Montana Supreme Court has followed this view even though Montana has a statute identical to NDCC 47–06–05. *See City of Missoula v. Bakke*, 121 Mont. 534, 198 P.2d 769, 772 (1948), construing Rev.Code of Mont. § 6820 (1935) (currently Mont.Code

These general observations lead to consideration of two additional statutes, both on avulsion, NDCC 47–06–06 [8] and, the subject of this decision, NDCC 47–06–07, which says:

"If a stream, navigable or not navigable, forms a new course abandoning its ancient bed, the owners of the land newly occupied take by way of indemnity the ancient bed abandoned, each in proportion to the land of which he has been deprived."

While this court has not construed either NDCC 47–06–06 or 47–06–07, it is evident that these sections also significantly modify common-law avulsion rules.[9]

At common law, avulsion did not result in a change of title; boundaries remained as before the avulsive change.[10] This basic common-law rule was applied whether the avulsive change resulted from natural or artificial causes.[11] Apparently, no court has refused to apply the common-law avulsion rule to artificial or man-made avulsion.[12] Consistent with the common-law rule, NDCC 47–06–07 appears to treat natural and artificial (man-made) avulsion alike.[13]

But, in another respect, NDCC 47–06–07 greatly modifies common law by providing that a particular kind of avulsion results in a change of title when a stream "forms a new course abandoning its ancient bed." In this situation, "the owners of the land newly occupied take by way of indemnity the ancient bed abandoned, each in proportion to the land of which he has been deprived." This transfer of title did not happen at common law.

### STATUTORY HISTORY

Using the well-developed presentation of the Furlong plaintiffs about the derivation of NDCC 47–06–07, which is not contested by the Sun defendants or the State, we survey that statute's history.[14]

---

Ann. § 70–18–201). *Compare City of Newport Beach v. Fager,* 39 Cal.App.2d 23, 102 P.2d 438, 442 (1940) and *City of Los Angeles v. Anderson,* 206 Cal. 662, 275 P. 789, 791 (1929), construing an identical California statute, § 1014 of the California Civil Code, as applying only to natural accretion.

**8.** NDCC 47–06–06 says:
"If a river or stream, navigable or not navigable, carries away by sudden violence a considerable and distinguishable part of a bank and bears it to the opposite bank or to another part of the same bank, the owner of the part carried away may reclaim it within a year after the owner of the land to which it has been united takes possession thereof."

**9.** NDCC 47–06–07 does not refer to a river "suddenly" abandoning its former bed.

**10.** *See Nebraska v. Iowa,* 143 U.S. 359, 361, 12 S.Ct. 396, 397, 36 L.Ed. 186 (1892). *See also* 2 R. Patton and C. Patton Land Titles § 303, p. 66 (cases cited at n. 90) (2d ed. 1957) and J. Grimes, Law of Surveying and Boundaries § 572 (4th ed. 1976) (formerly F. Clark, Clark on Surveying and Boundaries).

**11.** *See Puyallup Tribe of Indians v. Port of Tacoma,* 525 F.Supp. 65, 77 (Wash.1981), *aff'd,* 717 F.2d 1251, 1263 (9th Cir.1983), *cert. denied,* 465 U.S. 1049, 104 S.Ct. 1324, 79 L.Ed.2d 720 (1984) (Corps of Engineers dredged new channel); *Peterson v. Morton,* 465 F.Supp. 986, 1003 (D.C. Nev.1979) *rev'd on other grounds,* 666 F.2d 361 (9th Cir.1982) (rechannelization); *Witter v. County of St. Charles,* 528 S.W.2d 160, 162 (Mo.

App.1975) (Corps of Engineers diked and diverted main channel); *Gill v. Porter,* 248 Ark. 140, 450 S.W.2d 306, 308 (1970) (Corps of Engineers dredged new channel); *Parker v. Farrell,* 74 Wash.2d 553, 445 P.2d 620, 622–23 (1968) (avulsion caused by a logjam); *Whiteside v. Norton,* 205 F. 5 (8th Cir.1913), *cert. denied,* 232 U.S. 726, 34 S.Ct. 603, 58 L.Ed. 816 (1913), *writ denied,* 239 U.S. 144 (1915) (dredging changed channel); and *State v. Bowen,* 149 Wis. 203, 135 N.W. 494 (1912) (bridge construction changed channel).

**12.** "[W]hen the bed and channel are changed by the natural and gradual processes known as erosion and accretion, the boundary follows the varying course of the stream; *while if the stream from any cause, natural or artificial, suddenly leaves its old bed and forms a new one, by the process known as an avulsion, the resulting change of channel works no change of boundary, ...*" *Arkansas v. Tennessee,* 246 U.S. 158, 173 [38 S.Ct. 301, 304, 62 L.Ed. 638] (1918) (Emphasis added).

**13.** Like NDCC 47–06–05 (concerning accretion), NDCC 47–06–07 originates in the Field Code. But, unlike 47–06–05, which by its language applies only to "natural" accretion, 47–06–07 contains no such express limitation.

**14.** If a statute is unambiguous, we do not look beyond its plain language. *See* NDCC 1–02–05. But, we do consider historical background when construing an ambiguous statute. *See* NDCC 1–02–39 and *Kershaw v. Burleigh County,* 77

NDCC 47–06–07 did not codify common-law principles. It came to us, through the Field Code, from the Code Napoleon and the Digest of Justinian (Roman law).

The Field Code, enacted in Dakota Territory in 1865, was the immediate source of NDCC 47–06–07, although the Century Code cites the Territorial Civil Code of 1877 as the earliest source. In 1877, the Dakota Territory Legislative Assembly did make some revisions in its Field Code, apparently based on the California Revised Field Code of 1872.[15] No change, however, was made in what is now NDCC 47–06–07. Except for the headnote and numerical citation,[16] NDCC 47–06–07 remains identical to Field Code § 448 (1865) and Draft Field Code § 388 (1862).[17]

Both the 1865 Field Code and 1862 Draft Field Code annotate what is now NDCC 47–06–07.[18] The relevant Field Code annotation says: "This and the four sections following are similar to those of the *Code Napoleon,* Art. 559–563." Field Code, p. 135, annotation to § 444 (1865). The fourth section following is § 448 which is identical to NDCC 47–06–07.[19]

Art. 563 of the Code Napoleon, referred to in the Field Code annotation, states: "If a river or creek, whether navigable or floatable or not, opens itself a new bed by leaving its former channel, the owners of the soil newly occupied take, by way of indemnification, the former bed of the river, every one in proportion to the quantity of land he has lost." Annotation to 16 La.Civ.Code, Compiled Ed., art. 518 (1972) (translating Code Napoleon art. 563 (1804)).

Code Napoleon art. 563 was evolved from Roman law—specifically the Digest of Justinian.[20] The relevant part of the Digest, a statement of the whole of Roman law, says: "(7) In like manner, if a river leaves its bed and begins to flow elsewhere, anything which was built in the old bed will

N.D. 932, 47 N.W.2d 132, 135–36 (1951). *See also* N. Singer, Sutherland Stat. Const. § 48.03 (4th ed. 1984).

**15.** Some have assumed that the Dakota Field Code was adapted from the California Revised Field Code of 1872. *See, e.g.,* Note, 59 N.D.L. Rev. 211, 222 & 227. This confusion may have come about because the source notes of the North Dakota Century Code cited the Territorial Civil Code of 1877 as the earliest source of Dakota Territory's Field Code. In fact, however, Dakota Territory enacted the Field Code in December of 1865; Laws of Dakota Territory, §§ 1–2034 (1865). It was the first jurisdiction to do so, less than a year after David Dudley Field completed his final version. This is well documented. *See* Fisch, *Civil Code: Notes for an Uncelebrated Centennial,* 43 N.D.L.Rev. 485 (1967); 1 C. Lounsberry, North Dakota History and People 437–39 (1917); and 1 G. Kingsbury, History of Dakota Territory 429–30 (1915).

**16.** "No headnote, source note, or cross-reference ... constitutes any part of a statute. A headnote may not be used to determine legislative intent or the legislative history for any statute." NDCC 1–02–12.

**17.** The complete citation for the Field Code is Commissioners of the Code, The Civil Code of the State of New York, Report Complete (1865). David Dudley Field was only one of the Commissioners, but he is credited for having done most of the work on the Civil Code. There was also a preliminary report, cited as Commission-ers of the Code, Draft of a Civil Code for the State of New York (1862). Comparison of the 1862 Draft and 1865 Report Complete and conclusions of historians indicate that the Dakota Territory Legislative Assembly adopted the 1865 version. *See* 1 C. Lounsberry, *supra* at 437 and 1 G. Kingsbury, *supra* at 429. On the other hand, the New York Legislature never adopted either version. Fisch, *supra* note 14, at 486.

**18.** Consideration of annotations to the Field Code is just as appropriate as consideration of official comments to uniform or model acts. *See* N. Singer, Sutherland Stat. Const. § 52.05 (4th ed. 1984).

**19.** The relevant annotation in the 1862 Draft Field Code says: "This and the four following sections are similar to those of the Code Napoleon, Arts. 559–563." 1862 Draft Field Code, p. 96, annotation to § 384. Again, the fourth section following is § 388, which is identical to NDCC 47–06–07.

1865 Field Code § 443 is identical to North Dakota's accretion statute, NDCC 47–06–05. The annotation to § 443 cites two common-law cases and Code Napoleon art. 556–557 as sources.

**20.** *See* discussion in *Dickson v. Sandefur,* 259 La. 473, 250 So.2d 708, 716–17 (1971) and *see* 2 Civil Law Translations of Aubry and Rau, The Civil Law of France, "Property" § 203, Paragraph 208, Avulsion, n. 28 (Translation by Louisiana State Law Inst. 1966).

not come under the terms of this interdict, for what belongs to the neighbors on both sides is not constructed in a public stream; or, if the land has boundaries, the bed of the river will belong to the first occupant, and it certainly ceases to be public property.

"Moreover, although the new bed which the river has made for itself was previously private property, it at once becomes public; because it is impossible for the bed of a public stream not to be public.

"(8) A canal, made by human hands, through which a public river flows is, nevertheless, public property to such an extent that if anything is built there, it is considered to have been built in a public stream." 9 Scott, The Civil Law 302 (1932), translating Dig.Just. 43.12.1 §§ (7)—(8) (Ulpianus, On the Edict, Book 68).

Thus, NDCC 47–06–07 did not come from common law, but from French and Roman civil law. It is clear that Field intended to depart from and to modify common law.[21]

This historical review also shows the public policy underlying NDCC 47–06–07, as well as related sections. The excerpt from the Digest of Justinian expresses the Roman policy of protecting the public right of navigation. This policy is also apparent in the Code Napoleon.

In the United States, the policy of protecting the public right of navigation has been continued in the federal navigational servitude which applies to any navigable stream.[22] Paralleling Roman and Napoleonic civil law, this servitude follows the movement of a river, even where there has been an avulsive change. Manifestations of this policy have also survived in the common law by which a state's title shifts with the process of accretion and reliction and in the equal footing and public trust doctrines by which states hold title to the beds of navigable waters. NDCC 47–01–14 [23] and 47–01–15 [24] recognize this policy.

21. Field adopted civil-law provisions throughout the Field Code. This is reported in a study by Professor Rodolfo Batiza at Tulane University School of Law. *See* Batiza, *Sources of the Field Civil Code: The Civil Law Influences on a Common Law Code*, 60 Tul.L.Rev. 799 (1986).

22. *United States v. Cherokee Nation of Oklahoma*, 480 U.S. ——, 107 S.Ct. 1487, 94 L.Ed.2d 704 (1987) held that the Cherokee Nation was not entitled to just compensation for damage to sand and gravel deposits in the riverbed it owned under the navigable Arkansas River, which had been disturbed by construction of a navigational channel. The Court declared that the tribal ownership under the river did "not include the right to be free from the navigational servitude, for exercise of the servitude is 'not an invasion of any private property rights in the stream [or] the lands underlying it....'" 107 S.Ct. at 1492.

23. The source note to NDCC 47–01–14 also indicates that it was formerly codified as section 169 of the Dakota Territory Revised Code of 1877 and derived from section 670 of the California Revised Field Code of 1872. Like the source note to NDCC 47–06–07, this source note is misleading. NDCC 47–01–14, originally enacted as part of the Dakota Territory Field Code of 1865, said:
"The State is the owner of all land, below high water mark, bordering upon tide water; of all land below the water of a lake or stream which constitutes an exterior boundary of the state; of all property lawfully appropriated by it to its own use; of all property dedicated to the state, and of all property of which there is no other owner." Laws of Dakota Territory § 169 (1865).

This original language is identical to section 169 of the 1865 Field Code. Section 670 of the California Revised Field Code of 1872 was also identical to section 169 of the 1865 Field Code. In 1873–74, however, California amended section 670 to provide as follows:
"The State is the owner of all land below tide water, and below ordinary high-water mark, bordering upon tide water within the State; of all land below the water of a navigable lake or stream; of all property lawfully appropriated by it to its own use; of all property dedicated to the state; and of all property of which there is no other owner."

This California statute has not been changed since the 1873–74 amendment. *See* Cal.Civ. Code § 670 (West 1982).

In 1877, section 169 of the Dakota Field Code was amended. This section has not been changed since then and is now codified as NDCC 47–01–14:
"The ownership of land below ordinary high watermark and of land below the water of a navigable lake or stream is regulated by the laws of the United States or by such laws as under authority thereof, the legislative assembly may enact."

This language is quite different from the original or amended section 670 of the California Revised Field Code.

How can the source note to the Century Code be explained? No doubt many of the revisions

NDCC 47–01–15 says: "All navigable rivers shall remain and be deemed public highways." In cases of avulsion, however, the common law did not fully carry out this policy, since avulsion did not result in a change of title. In common law, a state's title to a riverbed did not follow an avulsive shifting of the course of a river.

On the other hand, at Roman law, the ownership of the bed of a river remained public with an avulsive change. Scott, *supra*, at § (7). This was so even if the avulsive change was man-made. *Id.* at § (8). The same result followed from the language of the Code Napoleon, which had evolved from the Digest of Justinian. See discussion in *Dickson v. Sandefur*, 259 La. 473, 250 So.2d 708, 716–17 (1971). The only difference between the Code Napoleon and Roman law was that, under Roman law, the owner of land riparian to the old bed took the old bed,[25] but under the Code Napoleon art. 563, the old bed was taken by the owner of land lost to the new channel. NDCC 47–06–07 also provides that the owner of land lost to a new channel becomes, proportionately, the owner of the old bed.

to the Dakota Territory Revised Code of 1877 were based on the California Revised Field Code of 1872 and on the amendments to the California Code adopted in 1873–74. Between 1875 and 1877, the Dakota Territorial Legislative Assembly generally reviewed its own 1865 code in light of California's work. *See* 1 C. Lounsberry, North Dakota History and People 439 (1917). In the course of this review, the Territorial Legislative Assembly seems to have realized that there was no tidewater in Dakota. In addition, the Assembly seems to have realized that the federal government held title to the beds of navigable waters in trust for the future state or states to be created out of Dakota Territory. The Territorial Assembly must have realized that it did not have the same authority as the legislature of the State of California to determine ownership rights to aquatic lands. For a discussion of the limited authority of the Territorial Legislative Assembly, see Note, 59 N.Dak. L.Rev. 211. These circumstances may explain why the general reference to federal law was substituted for the more specific language of the California statute. In any event, by 1877, the most basic principle of applicable federal law had already been established—states hold title to the beds of navigable lakes and streams. *See Pollard's Lessee v. Hagan*, 44 U.S. (3 How.) 212, 225, 11 L.Ed. 565 et seq. (1845).

24. NDCC 47–01–15 has a history similar to NDCC 47–01–14. Currently this section says: "Except when the grant under which the land is held indicates a different intent, the owner of the upland, when it borders on a navigable lake or stream, takes to the edge of the lake or stream at low watermark. All navigable rivers shall remain and be deemed public highways. In all cases when the opposite banks of any stream not navigable belong to different persons, the stream and the bed thereof shall become common to both."
Except for punctuation, it has remained unchanged since the Revised Code of 1877. *See* Dakota Territory Revised Code of 1877, § 266. Once again, the source notes to NDCC 47–01–15 indicate that this statute was derived from the California Revised Field Code of 1872, § 830; and once again, it appears that the Century Code source note is misleading. The original 1865 Field Code, at § 267, contained a similar provision, which was enacted by the Dakota Territory Legislative Assembly in 1865. Laws of Dakota Territory, § 267 (1865). It said:
"When land borders upon water which constitutes an exterior boundary of the Territory, the owner of the upland takes to high-water mark; when it borders upon a navigable lake where there is no tide, the owner takes to the edge of the lake at low-water mark; when it borders upon any other water, the owner takes to the middle of the lake or stream."
This language is nearly identical to § 267 of the 1865 Field Code. Since North Dakota has no tidewater, the Dakota Territory Legislative Assembly, in promulgating the Revised Code of 1877, eliminated all references to the tide. An introductory clause was also added which was borrowed from the California Revised Field Code § 830, as amended by the California legislature in 1873–74. The California provision has not been further amended since 1873–74 and is currently codified as Cal.Civ.Code § 830 (West 1982).
Note that when California enacted its Revised Field Code in 1872, it did not enact Field Code § 448 (the counterpart to NDCC 47–06–07). Accordingly, California cases are not helpful in this case.

25. The Roman law scheme is also followed in Texas. In other words, the state's title to riverbeds always follows the movement of the river, whether the movement is gradual or avulsive. But, the owners of land riparian to the old bed take the old bed. Texas law is derived from Spanish civil law. For a thorough discussion, see *Manry v. Robison*, 122 Tex. 213, 56 S.W.2d 438, 442–449 (1932). *See also Maufrais v. State*, 142 Tex. 559, 180 S.W.2d 144, 148–49 (1944). The reason that the drafters of the Code Napoleon modified Roman law by giving the old bed to the owner of the land lost to the new bed is explained in *Dickson v. Sandefur*, 259 La. 473, 250 So.2d 708, 716, n. 2 (1971).

### PRECEDENT

Counterparts to NDCC 47–06–07 are found in Louisiana, Oklahoma and South Dakota. *See* La.Civ.Code Ann. art. 504 (West 1980) (formerly codified as art. 518 (West 1952)); Okla.Stat. tit. 60, § 340 (West 1971); and S.D.Codified Laws Ann. § 43–17–11 (1983). The South Dakota and Oklahoma Supreme Courts have not construed their statutes.[26]

Like the Field Code, the Louisiana statute came from Code Napoleon art. 563 (1804). The current Louisiana statute provides:

"When a navigable river or stream abandons its bed and opens a new one, the owners of the land on which the new bed is located shall take by way of indemnification the abandoned bed, each in proportion to the quantity of land that he lost. If the river returns to the old bed, each shall take his former land."

La.Civ.Code Ann. art. 504 (West 1980) (formerly codified as art. 518 (West 1952)). Since originally enacted, this statute has been amended, but none of the amendments is relevant to this case (*e.g.*, prior versions did refer to both navigable and nonnavigable rivers.) For history, including reference to the Code Napoleon, see Annotation to 16 La.Civ.Code, Compiled Ed., art. 518 (1972).

■ Lousiana courts have construed this statute several times.[27] Since all cases refer to it by its former codification number of art. 518, rather than its current designation, we also refer to this statute as art. 518.

This statute was first applied in *State v. Richardson*, 140 La. 329, 72 So. 984 (1916), a case about title to producing oil wells as affected by accretion and the boundary of the state's title to the bed of the Red River.

In a petition for rehearing the State contended that it owned the bed of a slough which formerly had been part of the riverbed. Noting that this argument had not been presented in the pleadings, the court said: "But where a river or stream changes[ ] its course, and opens a new bed, the owners of the soil newly occupied take the former bed of the river. Civil Code, art. 518." *Id.* 72 So. at 993.[28]

This statute was applied in *Fitzsimmons v. Cassity*, 172 So. 824 (La.App.1937), where the Red River was eroding banks leading into and out of an oxbow. The Levee Board dug a cutoff which became the new channel of the river. The old channel became an oxbow lake. Defendant, who had built a duck blind in the old channel, contended that the oxbow lake belonged to the state since it was part of the original bed of the Red River. The court applied art. 518, held that the plaintiff, not the state, held title to the old bed, and declared that the state held title to the new bed.

"The underlying philosophy, as well as the equitable effect of appropriate application of this article, is obvious. The state has no right to acquire private property and not compensate the owner therefor. The beds of rivers, it is conceded, belong to the state in its sovereign right. Therefore, when a river changes its course and for this purpose appropriates private property for its new bed, the lawmaker, out of a spirit of justice and fairness, has wisely ordained, in effect, that the owner of the appropriated land shall be compensated for his loss by becoming the owner of the abandoned bed. All persons who acquire property adjacent to navigable streams are impressed with knowledge of the existence of this

---

**26.** The Oklahoma statute and related statutes on accretion, avulsion and islands are identical to the Field Code. While Oklahoma is not regarded as a "Field Code state," it did derive many of its statutes from the Laws of Dakota Territory. *See, e.g.,* source notes, Okla.Stat. tit. 60, §§ 335–340 (West 1971).

**27.** Consideration of similar statutes of other states and court decisions interpreting those statutes is appropriate and relevant. N. Singer,

Sutherland Stat. Const. §§ 52.01 through .03 (4th ed. 1984).

**28.** This statute was also referred to in *Strohecker v. Robinson*, 147 La. 652, 85 So. 627 (1920), where title was based upon accretion without reaching the question of ownership of an "abandoned" channel. See the explanation of *Strohecker* in *Dickson v. Sandefur*, 259 La. 473, 250 So.2d 708, 718, n. 7 (1971).

law and, of course, the sovereign, the source of the law, is bound by it." *Id.* at 828–29.

In dealing with the claim that the abandoned oxbow still held water, the court went on to say:

"It is contended that the abandoned part of the river is susceptible to navigation in fact and that for this reason its bed still belongs to the state. The water therein is deep enough for light craft to ply, but we do not think this fact alters the situation. The depth of the 'Old River' has been reduced materially by silt from the Red [R]iver and partakes more of the character of a shallow lake than it does a navigable stream. Being disconnected from any navigable stream, and surrounded by plantation lands, it can serve no useful purpose commercially. Anyway, article 518 of the Civil Code makes no exceptions in conferring ownership of abandoned rivers on those whose land has been taken by the new channel." *Id.* at 829.

In addressing the man-made nature of the change, the court stated:

"It is also argued that article 518 of the Civil Code does not apply as the adoption of the new channel across the 286–foot neck was encouraged by the act of man. We do not think this tenable. It was certain the river was destined very soon to connect at this point and the cutting of the canal only accelerated this event a brief time. It remains that plaintiff's author's land was 'taken' by the river without any act of his." *Id.*

In *Dickson v. Sandefur*, 235 So.2d 579 (La.App.1970), a circuit Court of Appeal held that art. 518 applied only to very sudden avulsive changes. Accordingly, the court refused to apply art. 518 to a cutoff by the Red River that had gradually formed over several years and was finally completed by a five-month flood. In a vigorous dissent, Judge Dixon argued that the statute did apply, citing other cases that had applied art. 518, including *Russ v. Ste-*

*phens,* 90 So.2d 501 (La.App.1956) and *Stephens v. Drake,* 134 So.2d 674 (La.1961).

On appeal, the Louisiana Supreme Court reversed, holding that art. 518 applied in any situation where a river forms a new channel and abandons the former channel "in such a manner as to be readily perceived in a departure not requiring the passage of much time." *Dickson v. Sandefur,* 259 La. 473, 250 So.2d 708, 719 (1971). A five-month flood caused the Red River to overflow its banks and to complete the formation of a new channel. Water flowed for a while in both the old and new channels, but when the floodwaters subsided siltation caused the flow in the old bed to cease, leaving an oxbow lake. *Id.* at 714–15. The supreme court discussed art. 518 in depth, comparing it with common-law decisions that more narrowly define avulsion.

"We recognize that the courts of other states and the federal courts have applied the terms 'avulsions' and 'cutoffs' in cases not too dissimilar to the present case. Of course we are not bound by these decisions. We do not find that they are clarifying of our specific Civil Code article or that thay [sic] are illuminating for our determination here. Although the legal principle set forth in our Civil Code Article 518 may be contrary to some of the legal principles enunciated in the cited common law cases, the proposition stated in the Code article is very clear and concise, and we are bound by it." *Id.* at 718.

Moreover, the court stated that the Court of Appeal in *Fitzsimmons, supra,* (the case where the Levee Board cut an artificial channel) "correctly applied Civil Code Article 518 to situations where a river had abandoned its old channel and occupied the land of another." 250 So.2d at 719. The court concluded that the former owner of the new bed "owns all the land where the old bed flowed—whether covered with water or dry—by indemnification under Civil Code Article 518." *Id.* at 720.[29]

---

**29.** The court stated that the boundary of ownership to the bed was to ordinary low watermark. 250 So.2d at 720. The court gave no citation for

this reference, but Louisiana has a statute similar to NDCC 47–01–15. *See* La.Civ.Code Ann. art. 456 (West 1980) (formerly codified as art.

Article 518 was recently considered in *Verzwyvelt v. Armstrong—Ratterree, Inc.*, 463 So.2d 979 (La.App.1985). An abandoned oxbow lake was occasionally inundated by overflow from the Red River. "The flow of water in the channel depends almost totally upon the level of the Red River." *Id.* at 985. Nonetheless, this oxbow was regarded as abandoned riverbed.

## DECISION

■ Construing our statute in light of its legal history and related public policy objectives, as well as the ample Louisiana precedents, we conclude that NDCC 47–06–07 applies to this case. Unless the Sun defendants or the State prevail on a remaining issue of fact or a separate defense, the Furlong plaintiffs have title to the oil and gas rights underlying the former riverbed.[30]

Given the development of the Field Code in North Dakota, this conclusion follows logically. The Territorial Legislative Assembly recognized that our state would receive title to the beds of navigable waters at statehood. Accordingly, by 1877, it had enacted a code that would secure title of the state to such lands and modify common law so that the state's title would follow the movement of the bed of the river. This accords with the underlying public policy, since the purpose of a state holding title to a navigable riverbed is to foster the public's right of navigation, traditionally the most important feature of the public trust doctrine. Moreover, it seems to us that other important aspects of the state's public trust interest, such as bathing, swimming, recreation and fishing, as well as irrigation, industrial and other water supplies, are most closely associated with where the water is in the new riverbed, not the old.[31]

■ The statute makes no exceptions in transferring ownership of abandoned riverbeds. Therefore, we hold that it applies with equal force to oil and gas rights.[32]

Our decision reverses a summary judgment and does not foreclose issues which have not yet been decided by the trial court. Whether the old riverbed has been abandoned or continues as a twin flowing channel of the Missouri River is a question of fact to be decided by the trial court on remand. Similarly, application of statutes of limitation and of the doctrine of laches turn on factual references which the trial court has not yet addressed.

Accordingly, we reverse the summary judgment and remand for further proceedings consistent with this opinion.

ERICKSTAD, C.J., and LEVINE, VANDE WALLE and GIERKE, JJ. concur.

455 and 457 (West 1952)). *See also Pizanie v. Gauthreaux,* 173 La. 737, 138 So. 650, 652 (1931).

**30.** We cannot, and do not, decide title to the bed of the new channel. That issue is not essential to our decision about title to the oil and gas under the old riverbed and the United States is not a party to this action. But, absent countervailing considerations, NDCC 47–06–07 and its ancestors, as well as the gist of the Louisiana precedents, imply the reciprocal of our holding today: The State of North Dakota ordinarily would have title to the oil and gas rights beneath the bed of the new channel. *Compare* Beck II at 445–446, speculating that the owner of the land under the new bed would continue to own it, along with that under the abandoned riverbed.

**31.** *See United Plainsmen Association v. North Dakota State Water Conservation Commission,* 247 N.W.2d 457 (N.D.1976). *See also Phillips Petroleum Co. et al. v. Mississippi et al.,* —— U.S. ——, 108 S.Ct. 791, 98 L.Ed.2d 877 (1988).

**32.** We have not been asked to determine ownership of the surface, separate from the oil and gas rights, under the old riverbed.